# In The Matter Of:

*Phatiffinia Robinson v.*
*James A. Rogers Excavating, Inc.*

*Phatiffinia Robinson*
*September 26, 2025*

*Kelly Hill, CCR*

Original File ROBINSON.txt
**Min-U-Script® with Word Index**   **EXHIBIT 1**

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

PHATIFFINIA ROBINSON            )
            PLAINTIFF,          )
VS.                             )NO.4:24-CV-852
                                )      DPM
JAMES A. ROGERS EXCAVATING,     )
INC.                            )
            DEFENDANT.          )

ORAL DEPOSITION OF

PHATIFFINIA ROBINSON

SEPTEMBER 26, 2025

KELLY D. HILL

CERTIFIED COURT REPORTER

STATE OF ARKANSAS

(501) 416-9329

Page 3

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFF:

    MR. SEAN SHORT
    SANFORD LAW FIRM, PLLC
    10800 FINANCIAL CENTRE PARKWAY, SUITE 510
    LITTLE ROCK, ARKANSAS 72211

ON BEHALF OF DEFENDANT:

    MR. JAMES D. ROBERTSON
    BARBER MUNSON
    ONE ALLIED DRIVE, SUITE 1600
    LITTLE ROCK, ARKANSAS 72202

Page 2

ANSWERS AND DEPOSITION OF PHATIFFINIA ROBINSON, a witness produced at the request of the Defendant, was taken in the above-styled and numbered cause on the 26th day of September 2025, 12:56 p.m., before Kelly Hill, a Certified Court Reporter, taken at Barber Munson, One Allied Drive, Suite 1600, Little Rock, Arkansas 72202, in accordance with the Federal Rules of Civil Procedure.

Page 4

S T I P U L A T I O N S

    The attorneys for all parties present stipulate and agree as follows:

Objections:
    Reserve all objections, except as to the form of the questions and the nonresponsiveness of the answers, until the time of trial, which objections are waived if not made at the taking of the deposition.

Signature:
    Waived.

Phatiffinia Robinson v.
James A. Rogers Excavating, Inc.

Page 5

INDEX

STYLE AND NUMBER . . . . . . . . . . . . . . . 1

APPEARANCES. . . . . . . . . . . . . . . . . 3

STIPULATIONS . . . . . . . . . . . . . . . . 4

DEPOSITION EXHIBIT INDEX . . . . . . . . . . 6


WITNESS:   PHATIFFINIA ROBINSON

    Examination by Mr. Robertson . . . . . . 7
    Deposition Concluded . . . . . . . . . .127

COURT REPORTER'S CERTIFICATE . . . . . . . .128

Page 6

DEPOSITION EXHIBIT INDEX

No. 1   Rate of Pay Agreement          Page  39

No. 2   Text Messages                  Page  59

No. 3   Charge of Discrimination       Page  77

No. 4   EEOC Determination and         Page  81
        Notice of Rights

No. 5   Original Complaint             Page  83

No. 6   Photograph                     Page  87

No. 7   Photograph                     Page  87

No. 8   Plaintiff's Responses          Page 110

No. 9   Text Messages                  Page 113

No. 10  Separation Form                Page 117

Page 7

PROCEEDINGS

PHATIFFINA ROBINSON, having been first duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, testified on her oath as follows:

EXAMINATION

BY MR. ROBERTSON:

Q. Please state your name for the record.

A. Phatiffinia Robinson.

Q. And do you go by Tiffany?

A. I do.

Q. Okay. I may mess up and just say Tiffany at any point. I'm Jim Robertson. We met just a minute ago. You are welcome to call me Jim. This is more formal than a normal conversation, but certainly a lot less formal than court, however, the deposition can be used for any purpose in litigation, so you will need to communicate as if you were communicating to a jury because it could be used that way. Have you ever given a deposition before?

A. No.

Q. All right. I want to cover a few ground rules. I'm sure Mr. Short has covered most, if not all these. But as you can see, Ms. Hill is

Page 8

taking down everything that we say. It will ultimately be transcribed into a booklet. Every time I ask a question there'll be a little Q. Every time you give an answer there'll be an A, and if we talk over one another, it all gets jumbled. So please wait on me to finish my question before you begin your answer. I in turn need to wait on you to finish your answer before I start my next question, otherwise, it's very difficult to read.

If we get too out of line, and we will at some point because human nature we all talk over one another, but she has to be able to do her job. So if I flag you down or if she flags us down, I do not intend to be rude, we just have to make sure the record comes through clearly, okay?

A. Okay.

Q. Also, because it's being transcribed, all answers need to be verbal. If you shake your head left or right or up or down, I'm going to know what you mean, but I will ask you whether you mean a yes or a no so that the record accurately reflects what you intend it to reflect.

Also, uh-huhs and huh-uhs are difficult to

Page 9

discern whether you mean yes or no, and if one of those comes out, I will ask if that's a yes or a no. I'm not being smart with you. Again, it's just to make sure the record comes through clearly, all right?

A. Okay.

Q. I'm not here to make you suffer in any way. If you need a break at any time, just say, hey, Jim, I need a break and we'll take it. The only request I have is that we finish whatever question is pending so that we can start back fresh when we get back on the record; is that fair?

A. Okay.

Q. Also, I am human. I do not ask perfect questions all the time. If I ask one you just don't follow, please let me know so that I can rephrase it or clean it up. Will you do that for me?

A. I understand.

Q. If you answer a question, everybody will assume you understood the question; is that fair?

A. Yes.

Q. All right. Where do you currently reside?

A.                                    .

Page 10

Q. That sounds familiar. How long have you been there?

A. I've been there a little bit over two years.

Q. Yeah. I think that was in your written discovery. You said Bryant or Benton?

A. Bryant.

Q. Are you currently married?

A. No.

Q. And you were married once, though, right?

A. Correct.

Q. And who was again?

A. DeShaun Cook.

Q. Does anybody reside with you at the

A. No.

Q. Do you have any children?

A. Yes.

Q. What are their names and ages?

A. Cameron Robinson is my son, he's 21. Camille Robinson is my daughter, she's 21. They are twins.

Q. You do not look old enough to have 21-year-old kids.

A. Thank you.

Q. And where do Cameron and Camille reside?

Page 11

A. Camille lives in Benton and Cameron lives in Benton as well. They both have their own separate apartments.

Q. And what does Cameron do for a living?

A. Cameron drives a truck.

Q. For whom?

A. Right now Cameron is unemployed. He just had a new son, so he's not working right now.

Q. So you have a grandchild, too?

A. Yes. I have four.

Q. Excellent. Where did he work?

A. He worked for -- I can't remember the name of the company right now.

Q. All right. Do you know if he has ever applied for work at James A. Rogers Excavating?

A. Not to my knowledge.

Q. What does Camille do for a living?

A. Camille just finished her CNA program, and she's a student.

Q. Is she employed?

A. No.

Q. While we're on family, if we end up having to go to trial, we have to identify family members basically to exclude them from the jury, just like Mr. Short would want to exclude friends and

Page 12

family of the owners of James A. Rogers Excavating.

What are the last names of your family members that reside here in Central Arkansas?

A. Robinson, Lindsey, McGhee.

Q. Sounds like we got a lot. Lindsey?

A. s-e-y.

Q. M-c-G-h-e-e?

A. Correct. Those are all of the names that I can think of at this time.

Q. What's your maiden name?

A. Robinson.

Q. Have you gone by any other names other than Robinson? Cook maybe?

A. Cook.

Q. Any others?

A. No.

Q. And is DeShaun Cook still in Central Arkansas?

A. Yes.

Q. What does he do for a living?

A. He drives trucks.

Q. Do you know for whom?

A. For blood hauling.

Q. Blood hauling. Do you know how long he's

Page 13

worked there approximately?

A. I do not.

Q. What type of driving does he do?

A. He drives dump trucks.

Q. So family members, Robinsons, Lindseys, McGhees. Are your parents still alive?

A. My mom.

Q. What's your mom's name?

A. Willie May Robinson.

Q. And where does she live?

A. In Little Rock.

Q. And do you know what she does for a living?

A. She's retired.

Q. What did she do before retiring?

A. Nursing.

Q. Where?

A. Arkansas State Hospital.

Q. And do you know what her role was there, or was it just a nurse?

A. I do not know.

Q. Okay. Do you have any siblings?

A. Yes.

Q. Do they live in Central Arkansas as well?

A. Yes.

Q. How many brothers and sisters do you have --

Page 14

or how many kids were there?

A. I have two brothers and two sisters.

Q. Okay. Who is the oldest?

A. My sister Stephanie Robinson, then my brother Cornell Robinson, my sister Monike Lindsey, and then my brother Charles Lindsey.

Q. Okay. Stephanie was number one?

A. Uh-huh.

Q. Robinson. Number two again?

A. Cornell.

Q. C-o-r?

A. n-e-l-l.

Q. Okay. And the third one?

A. Monike, M-o-n-i-k-e, Lindsey.

Q. And the last one?

A. Charles Lindsey.

Q. Charles, C-h-a-r-l --

A. Yes.

Q. And what does Stephanie do for a living?

A. I'm not sure.

Q. Are all these in Central Arkansas?

A. They are in Arkansas, correct.

Q. Okay. And your brother Cornell, what does he do for a living?

A. I'm not sure.

Page 15

Q. And Monike?

A. I'm not sure.

Q. And Charles?

A. I'm not sure.

Q. Do you know if any of your family members, siblings, aunts, uncles, mom, cousins, anybody like that, do you know if any of those folks hold any leadership positions in the community?

A. Not to my knowledge.

Q. Do you know if any of those folks hold any leadership positions in their churches?

A. Not to my knowledge.

Q. Do you hold any leadership positions in the community?

A. No.

Q. Do you hold any leadership positions in any church or other organization?

A. No.

Q. And we actually control the air in here. You actually get to decide if it's hot or cold, so if you let me know, we can adjust it on the wall over there, okay?

A. Okay.

Q. How old are you?

A. I'm 41.

Page 16

Q. And your date of birth?

A. August 16, 1984.

Q. Have you been in any other lawsuits?

A. No.

Q. Have you made a claim against anybody else for monetary damages whether or not it went to a lawsuit?

A. No.

Q. Have you ever filed a Workers' Compensation claim?

A. No.

Q. Have you ever filed a claim against an insurance company for personal injury?

A. Not to my knowledge.

Q. Have you filed any other EEOC claims other than this one against James A. Rogers?

A. No.

Q. Have you filed any claims with the National Labor Relations Board or the Department of Labor?

A. No.

Q. Have you ever been arrested?

A. No.

Q. How far did you go in school?

A. I completed school. I completed high school.

Q. From where?

Page 17

A.  McClellan High School.
Q.  McClellan.  And that would have been '96?  Did I guess right?  When did you graduate high school?
A.  '01.
Q.  '01.  Yeah, that would have made you way young.  My math is bad.  I shouldn't do math in public.  Okay.  High school graduation McClellan 2001.  Did you have any training or education after high school?
A.  Yes.
Q.  Describe that for me, please.
A.  I attended Pulaski Technical College.
Q.  From when to when?
A.  I'll say from 2008 maybe till 2010.
Q.  And I'm gathering that's an estimate on your part?
A.  Yes.
Q.  All right.  What was the degree program you were pursuing?
A.  Allied Health.
Q.  A-l-l-y?
A.  A-l-l-i-e-d.
Q.  Allied Health?
A.  Uh-huh.

Page 18

Q.  And what is that?
A.  It falls under a scope of many different fields under nursing.
Q.  Once you completed that degree program, would you have been a nurse?
A.  Yes.
Q.  Like an LPN, an RN?
A.  Yes.  LPN once I complete.
Q.  And did you complete that program?
A.  No.
Q.  You're wearing scrubs of some sort today?
A.  Correct.
Q.  What do you do now?
A.  I'm a CNA.
Q.  Did you go back to get your CNA license?
A.  I did.
Q.  And when was that?
A.  I just completed the program maybe like a week or so ago.
Q.  And where are you working?  I can't read that.
A.  The Blossoms.
Q.  What is The Blossoms?
A.  It's a nursing home.
Q.  Where is it located?

Page 19

A.  In North Little Rock.
Q.  And what are your job duties there?
A.  To assist the residents with their daily living and needs.
Q.  And when did you start at The Blossoms?
A.  I actually started on Wednesday.
Q.  So two days ago?
A.  Yes.
Q.  That makes that September 24.  Is this a full-time job?
A.  Yes.
Q.  And what is your rate of pay?
A.  19 an hour.
Q.  That was obviously your starting pay?
A.  Yes.
Q.  Do you have a probationary period you have to complete before you get another pay raise?
A.  Yes, but we haven't went over any of that yet, so I'm not sure.
Q.  Fair enough.  But at some point, in the reasonable near future, are you expecting a pay raise?
A.  Hopefully.
Q.  Do you know who owns The Blossoms?  Usually it's some kind of corporation.

Page 20

A.  I do not.
Q.  All right.  Where did you get your CNA license or certifications?
A.  At New Leaf Logistics.
Q.  New Leaf Logistics?
A.  Correct.
Q.  And how long did you have to go there to get this certification?
A.  I went two to three weeks.
Q.  Two to three weeks?
A.  Correct.
Q.  So was that over the last month?
A.  Yes.
Q.  Is health care -- now, I know you were a truck driver, and we're going to talk about that in a lot of detail here in a little bit.  But outside of this recent stint, have you ever worked in the health care field before?
A.  Yes.
Q.  Okay.  Well, we'll come back to it.  So we're actually talking about your education.  We've got the 2001 high school grad McClellan.  Pulaski Technical College, attended for a couple of years in approximately 2008 to 2010.  And we know you have your CNA courses that you attended over the

Page 21

last month or so.  What other training or education do you have?

A.  I'm a licensed aesthetician.

Q.  Okay.  What does that mean?

A.  I specialize in skin care.

Q.  And where did you get that training?

A.  Arkansas Beauty College.

Q.  And when did you get that degree?

A.  I completed the program July of last year, '24.

Q.  How long did you have to attend Arkansas Beauty College to get that licensure?

A.  Six months.

Q.  Did you get any other certifications from Arkansas Beauty College?

A.  No.

Q.  Do they offer others?

A.  Yes, they do.

Q.  Like barbering or something?

A.  Yes.

Q.  What do they cover?

A.  Cosmetology.

Q.  Cosmetology.  But you didn't -- an aesthetician is different than cosmetology?

A.  Yes.

Page 22

Q.  I'm obviously a guy, and I just don't know.

A.  Okay.

Q.  So what do you do with this certification; is it makeup or --

A.  Yes, makeup, lashes, facials, waxing, things of that sort.

Q.  Just skin care type stuff?

A.  Correct.

Q.  Have we covered all of the training and education that you can recall, at least at this moment?

A.  Besides me getting my CDL.

Q.  CDL, let's talk about that.  When did you get your CDL?

A.  I believe it was -- I'm not sure of the year, '22 or '23.

Q.  And where did you get that from?

A.  I went to CDL Training Academy.

Q.  Where is that?

A.  It was located in Little Rock.

Q.  And how long did it take you to get your CDL license from CDL Training Academy?

A.  I don't remember.

Q.  Give me a guess.  Was it like months, weeks, years?

Page 23

A.  Took about a month.

Q.  And as part of that program, were you able -- is getting your CDL part of the program?

A.  Correct.

Q.  So I assume there's training on trucks and probably testing on safety and all that kind of thing?

A.  Yes.

Q.  And then you complete the course work.  Then do you go take the test to get your CDL?

A.  Yes.

Q.  Okay.  How many times did it take you to pass your test?

A.  I passed both tests, the written and the driving on the first try.

Q.  And what type of vehicle did you drive during your testing?

A.  An 18-wheeler tractor trailer.

Q.  Did it have the trailer on it?

A.  Yes, it did.

Q.  What kind of trailer?

A.  I think it was a 48 inch trailer on the back.

Q.  Was it a box or flatbed?

A.  Box.

Q.  And that was a vehicle provided by CDL

Page 24

Training Academy?

A.  Yes.

Q.  All right.  So we basically have five educational paths for you, if I've got them all.  Before I summarize them, I've been through a lot of depositions, and there's not been one yet where something didn't come to you that you needed to add to or change from an earlier answer, and most people are just too polite and will think, I'm going to wait on Jim and I'll tell him at the end.  Don't do that because you may not remember.

A.  Okay.

Q.  If something comes to you that you want to change, add to, amend, whatever, interrupt me, tell me whatever it is, and then I'll get back on track.  You'll see me do the same thing with my questions.  I'll bounce back to something I forgot to ask you, and it's just best to cover it while you're thinking about it, because if you forget, then it can create a problem, okay?

A.  Okay.

Q.  So if something else comes up to you on the list of education, just shout it out at any time will be fine with me.  But we've got your high

Page 25

school education, Pulaski Technical College, no degree obtained but a year or two; CNA recently completed; licensed anesthetician in 2024, CDL in 2022 or 2023. Does that cover all of them that you can remember at this time?

A. Yes.

Q. All right. Let's shift to your job history. So in thumbnail sketch, after high school in 2001, what type of jobs did you have?

A. After high school?

Q. Yeah. Like what was your first major job after high school?

A. I worked for the Heritage Company and GC Services. Call center work is what I did fresh out of high school.

Q. Is that the same --

A. No. They're different companies. I believe they are all out of business, but I'm not sure.

Q. Okay. Where was the Heritage Company?

A. That's in Sherwood.

Q. Is that over there kind of by the hospital over there in Sherwood?

A. It is.

Q. I remember that place. I remember the call center being there. How long did you do that

Page 26

type of work?

A. A few months.

Q. And what was next?

A. Just the call center. There was a time that I didn't work. I didn't work consistently fresh out of high school.

Q. And that's fine. And a lot of folks in your position might say, you know, I worked off and on at the Sonic, or I worked wherever?

A. Yeah.

Q. And just thumbnail sketch as best you can remember. I'm really looking for what categories of employment.

A. Okay.

Q. So after Heritage Company, you said there was another one. G something?

A. GC Services, Flake Wilkerson. I've worked for Kroger. That's all I can think of right now.

Q. What is GC Services?

A. A call center.

Q. Where was that one?

A. In west Little Rock.

Q. And what time frame are we talking about on that one? A guess is fine.

A. I want to say 2001, 2002, somewhere.

Page 27

Q. So pretty fresh after high school?

A. Uh-huh.

Q. What is Flake Wilkerson?

A. A call center.

Q. And it's the same time frame?

A. Yes.

Q. What did you do at Kroger?

A. Cashier.

Q. Which Kroger?

A. I worked at the Kroger on Polk Street.

Q. Is that the Heights?

A. Yes.

Q. How long did you work there?

A. A few months.

Q. What does that take us up to in the time frame? Are we to 2010 yet?

A. Yeah.

Q. Okay. Where do you remember working, what other jobs --

A. I don't remember. There was a few years I didn't work.

Q. But we know in that 2008 to 2010 time frame you were in school. Did you work while you were in school?

A. No.

Page 28

Q. Were you married at that time?

A. No.

Q. After your time at Pulaski Tech ends ballpark 2010, so we've got roughly a 10-year window -- 12-year-window I guess between then and your CDL. In that gap, what type of jobs did you do? And it may be stay-at-home mom?

A. Yeah, that's what I did, stay-at-home mom. At the time I was engaged, so my fiance was working.

Q. All right. And was that DeShaun or somebody else?

A. DeShaun.

Q. All right. And when did you reenter the work force?

A. Around 2014.

Q. And what did you do then?

A. I had my own small business. I sold women's shapewear.

Q. Was there a name for that business?

A. Hourglass.

Q. And where was it located?

A. In Little Rock.

Q. Did you have a commercial residence for the business or did you operate out of your house?

Page 29

A.  I had a commercial property.

Q.  Where was that?

A.  In west Little Rock off of Rodney Parham.

Q.  And how long was that -- how long was Hourglass in business?

A.  About three years.

Q.  And did you work anywhere else for the three years that you were operating Hourglass?

A.  Not that I can remember.

Q.  So ballpark Hourglass ran from 2014 to approximately 2017?

A.  Yes.

Q.  All right.  And what did you do after Hourglass?

A.  Unemployed and stay-at-home mom.

Q.  And how long did that last?

A.  Until I decided to get my CDL in -- it was '22.

Q.  What motivated you to do that?

A.  I wanted to do something different and get into a different career field.

Q.  All right.  And once you obtained your CDL, what was your first job?

A.  My first job was USA Truck.

Q.  Where?

Page 30

A.  That was out of Waxahachie, Texas.

Q.  Did you move to Texas?

A.  I did.

Q.  Had you otherwise resided in Little Rock --

A.  Yeah.

Q.   -- your entire life until that point?

A.  Yes.

Q.  USA Truck, Waxahachie.  All right.  And what were your duties for USA Truck?

A.  I was a driver.

Q.  18-wheeler?

A.  Yes.

Q.  Over-the-road?

A.  Over-the-road 18-wheeler.

Q.  And how long did you work for USA Truck?

A.  I worked there for a few months.

Q.  And why did your employment with USA Truck end?

A.  I moved back to Arkansas.

Q.  Did you quit or were you fired?

A.  I quit.

Q.  And why did you quit?

A.  Because I wanted to move back home and be with my children.

Q.  Yeah.  So none of your kids moved with you?

Page 31

A.  No, they did not.

Q.  My understanding is you're divorced.  Were you divorced at that time?

A.  I was.

Q.  I should have asked this when I asked you about DeShaun earlier.  Approximately when were you and Mr. Cook married?

A.  June 14, 2014.

Q.  And approximately when did you divorce?

A.  I don't remember.

Q.  Or separate?

A.  We separated in '22.  I don't remember when the divorce was finalized.

Q.  Did you have a job lined up when you quit USA Truck?

A.  No.

Q.  All right.  And what was your next job after USA Truck?

A.  Redstone.

Q.  Here out of Little Rock?

A.  Yes.

Q.  And what did you do for Redstone?

A.  Drive dump trucks.

Q.  And when did you start working for Redstone?

A.  I'm not sure of the month, but once I moved

Page 32

back to Arkansas I did.

Q.  I think you started James A. Rogers in May or June of '23, so using that as kind of a benchmark, what is the time frame that you think you worked for Redstone?

A.  I worked for Redstone for about two to three months.  I'm not sure what month I started or when I left there.

Q.  Why did you leave Redstone?

A.  Because of hour shortage.

Q.  What does that mean?

A.  They cut our hours, and they switched us to nights instead of days.

Q.  Did you give them a notice and said, I don't like this, I'm quitting?

A.  Yes.

Q.  Was there a project in particular you were working on?

A.  No.

Q.  Was there any pattern to how you were driving the dump trucks for Redstone?  Like, for example, you know, there may be a project going on on the south part of town where you're picking up a load here, and you may make that trip five times in a day.  Was there anything like that that was

Page 33

routine, if you will, for Redstone?

A. I'm not understanding your question. Are you asking me did we do the same thing every day?

Q. Yes. That's a good way to -- that's a better way than I did.

A. Yes.

Q. Okay. And what was that?

A. Hauling materials to and from the job site depending on the location.

Q. And the types of materials would be what?

A. B stone, A stone, 57 rock.

Q. Okay. So would you get these from a quarry somewhere?

A. Yes.

Q. Is there a quarry in particular that you always went to?

A. Went to different quarries.

Q. I don't know. You can probably tell from looking at me I don't understand what your job was. Is there any pattern as to quarries that you would go to regular, and then off to a job wherever they would assign you?

A. Just depends on the job that day determines the quarry that you're going to go to.

Q. Who was your manager at Redstone?

Page 34

A. I don't remember.

Q. You say you worked there for how long again?

A. A few months.

Q. And did you quit or were you fired?

A. I quit.

Q. And again, you said you gave notice, right?

A. Yes.

Q. Did you have a job lined up when you quit Redstone?

A. No.

Q. How long were you off work before you got your next job?

A. I want to say a few weeks to a month.

Q. And was that James A. Rogers?

A. Yes.

Q. Do you think you were off work for more than a month before working at James A. Rogers?

A. Possible.

Q. Was it possible that you were off more than two months -- I'm just -- I don't want you to guess. I'm trying to get a date range for how long you think you were unemployed?

A. I'm not sure.

Q. Would it have been less than six months?

A. Yes.

Page 35

Q. Would it have been less than three months, if you know?

A. Yes. One to three months.

Q. Okay. Do you remember applying anywhere other than James A. Rogers Excavating during that month to three-month period after you left Redstone?

A. I did apply for other jobs. I'm not sure what other companies, but I applied through Indeed, the same way that I applied for Rogers through Indeed.

Q. Were you looking exclusively for driving jobs or something else?

A. Driving.

Q. Did you have restrictions on that? Like some folks won't take interstate, you know, you're going to want to be home every night. Did you have any type of requirements like that that you were looking for?

A. The only restriction I had on my driver's license was I couldn't operate manual speed.

Q. No, I meant for the types of jobs you were looking for, were you only considering certain types, such as -- you know, you can get a job anytime driving a truck, but you may be gone for

Page 36

two weeks, you know, that kind of thing. Were you focusing on any types of industries for reasons like that?

A. I was focused on the dump truck industry so I could be local. Can I have a bathroom break?

Q. You sure can.

(A break was taken.)

(Back on the record.)

Q. (By Mr. Robertson) We're back on the record after a break. I know you mentioned you were focusing on the dump truck industry. Do you remember who else you would have applied to in and around the time you applied to James A. Rogers?

A. I don't recall.

Q. Did you know anybody at James A. Rogers when you applied there?

A. No.

Q. And how did you find out about them?

A. They had an ad on Indeed.

Q. Outside of the information that was on Indeed, were you able to research anything else to tell you about the company?

A. No.

Q. What did you learn about the company?

Phatiffinia Robinson v.
James A. Rogers Excavating, Inc.

Phatiffinia Robinson
September 26, 2025

Page 37

A. That they needed a dump truck driver.

Q. Do you know anything about the ownership structure?

A. No.

Q. Who owns it or anything like that?

A. No.

Q. Do you remember who hired you?

A. I don't remember his name, but now I know it was I guess the dad.

Q. Ken Meyer?

A. Okay.

Q. Sound right?

A. That sounds familiar, yes.

Q. Okay. I've got something here that shows the start date. So you're on board. You've been on board with other companies before, and you fill out your W-4 and all that kind of stuff --

A. Uh-huh.

Q.  -- on the day of hire, correct?

A. Correct.

Q. There would have been -- I have all that, but this is probably the most relevant document. It was a rate of pay agreement for 18.50 an hour. Looks like it was signed -- well, it says 3/30/23 for you, but it says Ken Meyer 5/9/23 for him.

Page 38

I'll show you that document. Do you recognize it?

A. Yes.

Q. All right. And is that your signature at the bottom of it?

A. Yes, that's my signature.

Q. Okay. Now --

A. But this --

Q. I don't understand what you are pointing to.

A. Well, you said he signed this on 5/9.

Q. Well, I don't know. There's a date there that says 5/9. And really all I'm trying to find out is your start date.

A. I signed it, yes, I did.

Q. Yes, but there's a signature -- a date next to yours in March?

A. Uh-huh.

Q. And a date next to Ken's signature in May?

A. May, uh-huh.

Q. Do you remember when you signed that?

A. It must have been March if that's the date that I signed.

Q. And do you know why -- when did you start?

A. I don't remember.

Q. You don't remember. All right. Let's go

Page 39

ahead and mark this as Exhibit No. 1 since we've identified it in the record. Do you recall that your starting pay was 18.50 per hour?

        (Deposition Exhibit No. 1 was marked.)

A. 18.50?

Q. 18.50 per hour like what's in Exhibit 1?

A. Yes.

Q. That was your pay?

A. Yes.

Q. And it says underneath that pay rate may be reviewed after 30 days, correct?

A. Yes.

Q. All right. Did you have any pay raises before you left employment at James A. Rogers?

A. I did not.

Q. All right. Did you interview only with Ken, the dad?

A. Yes.

Q. Okay. Do you remember speaking with anybody else?

A. Well, when me and Ken was talking, I believe Chris came in and spoke and Mrs. Meyer.

Q. The mom?

A. Yes. The mom was at the front office, and I

Page 40

spoke to her.

Q. Sherry, is that right?

A. I'm not sure. That may be her name.

Q. All right. So Ken did most of the talking. Did Ken extend the offer?

A. He did.

Q. All right. And did Chris do anything other than come in and say hi?

A. No.

Q. But you understood Chris Meyer is the actual owner?

A. I didn't know that right off the bat.

Q. You learned that after the fact?

A. Yes. I learned that after I was already employed.

Q. And was that at the offices at the end of Baseline Road?

A. Yes.

Q. And after that interview, how long was it before you started working?

A. After he interviewed me, I went into the drug screen. Once they got the results they called me back, and I believe I started that following week.

Q. Okay. And who was your supervisor?

Page 41

A.  Well, we didn't have a supervisor.  We had a truck boss.

Q.  Truck boss, who was that?

A.  Adam.

Q.  Adam Parker?

A.  Yes.

Q.  On any given day, who would give you your job assignments?

A.  Adam.

Q.  Adam.  Would anybody else?

A.  No.

Q.  And the reason I ask, there's a text message that you produced in discovery, and we're going to pull it out and talk about it.  It's kind of a combination of a text you sent to Chris, but there's also some instructions from him back to you about where to take some loads or something like that, and that's why I'm asking.  Was Chris ever involved in that?

A.  At the beginning of the day when we got there, Adam will give us our jobs, we would receive our information via text message.  Sometimes if the job changed throughout the day, you could get a text from Chris saying to go to another plant and get materials and take it

Page 42

somewhere else.

Q.  So if you got job assignments, routinely it was Adam Parker, but sometimes it could be Chris as well?

A.  Yes.

Q.  My understanding is you worked there about two months from May to June, July, somewhere in there?

A.  It was close to three months, because I was terminated right before my 90 days.

Q.  Okay.  And my understanding is you have some complaints about Adam, and we're going to take those, probably cover it three times with you, but outside of Adam, was there anybody else that you have an issue with?

A.  Babbitt.

Q.  Babbitt?

A.  Uh-huh.

Q.  And tell me again who Mr. Babbitt is.

A.  He was the GM.

Q.  And when -- when would you typically encounter Mr. Babbitt?

A.  Just different job sites.  Sometimes he would be the loader guy on the job site.

Q.  When you encountered Mr. Babbitt, since he's

Page 43

the GM I take it he was over you?

A.  Yes.

Q.  And what were your problems with Mr. Babbitt?

A.  He was rude.  He was disrespectful.

Q.  In what way?

A.  In his language, the way he would communicate with me.  He would belittle me and downtalk.  He was just not good with speaking to people with respect.

Q.  So he's just not a -- is he a gruff person?

A.  Yeah.

Q.  Okay.  Well, those are all conclusions, even me saying gruff.  I need to know what he actually did or said to the extent that you can recall, if you can recall?

A.  The day that I was -- well, there was an incident where I was on the yard pulling up, and my windows were down.  He yelled at me and cursed and told me to roll the window down.  The window was down, and I stated that.  He said, you know, if you're not going to listen -- he just said some verbiage to me.  At that time I contacted Chris, and I told him that I needed to speak with him because of some things that Babbitt had said and also some comments that Adam had made

Page 44

previously and earlier in the week that I found offensive.

Q.  Let's take them one at a time.  For Babbitt, he's -- was he yelling at you to roll your window down?

A.  And it was already down, yes.

Q.  Okay.  And he cursed saying roll your window down like --

A.  Roll your f'ing window down.

Q.  Okay.  Did he say anything else that offended you?

A.  He said that I wasn't listening to him.

Q.  Okay.  Are there any other instances when Babbitt said inappropriate things to you?

A.  Yes.

Q.  What do you remember?

A.  The day that I was terminated, I was speaking with another employee John, and Babbitt told John, tell Tiffany to take her ass back to the yard; Adam is going to handle her.

Q.  Babbitt told John tell Tiffany to take her ass back to the yard; Adam is going to handle her?

A.  Correct.

Q.  All right.  And do you know what that was

Page 45

about?

A. Well, when I got back to the yard I was fired.

Q. Okay. Did you actually hear Mr. Babbitt say these words or did John tell you that's what Babbitt said?

A. I heard him.

Q. You heard him?

A. Yes. We were all -- the trucks were down because of the -- I don't know if it was the weather that day, but we were all sitting at the WalMart in Maumelle on the lot waiting, because we were doing the burger joint they built over there.

Q. Did you say anything to Babbitt after you heard him say this?

A. No.

Q. Did John have to tell you anything, or did you just automatically hear it and leave? What happened?

A. John and Babbitt were over there talking. I heard Babbitt mention Tiffany and say my name and say what he said. John came back over and told me again. I got in the truck and I left.

Q. Did he say it the same way that Babbitt said

Page 46

it to John or did he tone it down; how did he communicate it?

A. He just said it regular.

Q. Like you need to go to the office?

A. Yes.

Q. And I'm putting words in your mouth there. If you can recall, tell me what John said to you.

A. John said, Tiffany, did you hear Babbitt, and I said I heard him a little. He said, yeah, he told me to tell Tiffany to take her ass back to the yard; Adam is going to handle you. I was like, what does that mean.

Q. Okay. Did you say anything back to John?

A. We just kind of looked at each other.

Q. Was there any other conversation with John in that instance?

A. No.

Q. And then did you get in your truck and go back to Baseline Road?

A. I did.

Q. And did you meet with Adam at Baseline?

A. I did.

Q. Before we get to that, let's talk about all other instances with Babbitt. You've identified to him yelling at you roll your window down and

Page 47

this, you know, Babbitt telling John, go tell Tiffany to take her ass back to the yard. Are there any other statements or inappropriate treatment you attribute to Mr. Babbitt?

A. Other than him just being rude on the jobs, no.

Q. Well, lawyers have to get what we call closure, and all that means is we don't want to hear things for the first time at trial. That's why we're here today is to hear everything, and we don't want to hear it for the first time at trial. When we do, it's not pretty. I'm just being 100 percent honest with you. If you can remember anything else that you think Babbitt did that was harmful for which you think you are entitled to compensation, I need to know about it, focusing on Mr. Babbitt.

A. Babbitt had -- there was another young lady that worked for the company. I told Adam about this young lady that would kind of pick with me, and Adam said, you know, don't worry about it, she's always like that with new female drivers. Well, she would go and say little stuff to Babbitt about me, which would cause him to act different towards me on the job.

Page 48

Q. So this -- we call that mean girl stuff. This other female driver doing mean girl stuff, who was that?

A. I don't remember her name. She's been there for quite sometime. Blonde-haired female.

Q. And if I understand, you think she's poisoning the well, so to speak, with Babbitt about you?

A. Yes.

Q. Okay. Do you know specifically what the mean girl would have said to Babbitt, if you know?

A. I don't know. I would just see them looking at my truck and laughing, or either if I come in, they'll point at me and say something and laugh at me.

Q. So whatever the blonde girl was saying with Babbitt, you couldn't hear, but you perceived at least that they were pointing or laughing at you?

A. Yes, they were. I saw them visually.

Q. Anything else that you attribute to them for which you think you're entitled to compensation, focusing on Babbitt and the blonde girl now?

A. At this time, I can't recall anymore incidents with Babbitt.

Q. Okay. All right. Before we shift to Adam,

Page 49

you said Babbitt told John.  Who is John?

A.  John was one of the drivers.

Q.  Do you remember John's last name?

A.  I do not.

Q.  Did John have any supervisory authority?

A.  No.  He was a driver just like me.

Q.  Okay.  Did he have more seniority than you?

A.  Yes.  He had been at the company for quite sometime.

Q.  Okay.  So we know Babbitt, we know Adam.  Adam I'm expecting to spend the most amount of time on.  Is there anybody else that we need to cover, other than those two guys, as far as people who were inappropriate toward you?

A.  Not that I can recall at this time.

Q.  Okay.  So let's go ahead and dive into Adam Parker.  Well, let me back up.  I should have asked this earlier.  Is there anybody with whom you were employed at James A. Rogers that you knew before you went to work there?

A.  I knew no one before I worked there.

Q.  Have you stayed in contact with any of the employees since you left James A. Rogers?

A.  I have talked to one or two of them since I've left.

Page 50

Q.  Who?

A.  I've talked to Quinton, I've talked to John, I've talked to Brian.

Q.  Quinton is another driver?

A.  Yes.

Q.  John is the same driver you were just talking about?

A.  Yes.

Q.  And Brian is who?

A.  Brian is the driver that was there the day on the yard when Adam made the comment to me, and also the other older lady that was there, I can remember her name now.  It was Miss Connie.

Q.  Connie is the mean girl driver that --

A.  No.  Miss Connie is the older lady that was out on the yard the day Adam made one of the comments.

Q.  Okay.  So we're not actually to Adam yet?

A.  So it was an incident with Connie and me and Adam, and it was an incident with Brian and Adam and I.

Q.  Okay.  And do you know Connie's last name?

A.  I do not.

Q.  Do you know Brian's last name?

A.  No.

Page 51

Q.  Do you know John's last name?

A.  No.

Q.  Do you know Quinton's last name?

A.  No.

Q.  That's fine.  All right.  Let's talk about Adam in sequential order, so essentially from the beginning of your employment through the end, what did Adam do wrong?

A.  Adam made sexual comments towards me that was very offensive.

Q.  And specifically what did he say?  This is -- you know, we say conclusions.  Conclusions aren't the actual evidence.  It has to be he said this or he said that, so to the extent you can give me in detail, what did Adam say?

A.  Yes.  One morning while we were on the yard pretripping our trucks, Adam goes around to each driver and we talk about our duties for the day.  That particular morning we were all standing together, it was me, Adam and Brian, and Adam was telling me what I needed to do today, just regular conversation in the morning.  Brian came up and they started talking, and somehow the conversation got on leggings.

Q.  Leggings?

Page 52

A.  Leggings.  Yes, leggings.  We were talking about safety colors, and Brian said, Tiffany, yeah, you like to wear leggings, and I said, yeah, I do.  He said, you know at the flea market in Beebe, they have safety color leggings that are neon green, and we have some neon orange ones, and Adam said, yeah, if you put those on, we'll see your ass from a mile away.

Q.  And Brian was present for that?

A.  Yes, he was right there.  They laughed it off.

Q.  Was anything else said?

A.  No.  I walked away to my truck.  The second --

Q.  Hold on.  Let me finish my notes here.  Okay.  You were talking about getting some leggings.  You say neon yellow leggings, and he says, you get those and we'll see your ass from a mile away?

A.  Yes.

Q.  Tell me verbatim, to the best you can say, exactly what he said.

A.  Okay.  So they were talking about safety colored leggings.  He said, you know the flea market in Beebe has neon colored leggings, green

Page 53

and orange.

Q. Brian said that?

A. Brian said that, because I would wear leggings to work, but I would wear black ones with a T-shirt that was a long T-shirt, my work shirt which was safety colors.

Q. And again, what exactly did Adam say?

A. Adam said, if you get those, we'll be able to see your ass from a mile away.

Q. And you didn't hear him say anything after that because you left to go to your truck?

A. Well, they kind of laughed, but I walked off.

Q. Does that conclude Incident No. 1, so to speak, with Adam?

A. Yes.

Q. What was next with Adam?

A. The second incident was when I was telling Miss Connie that I was having problems out of one of the older guys that was a loader. He was pretty rude. And Miss Connie was talking and she said, well, Tiffany, don't worry about it; he's kind of always grumpy like that. Adam overheard us talking. He walked up and he's like, what are y'all talking about, I told him. And Miss Connie said, yeah, I was telling Tiffany he's always

Page 54

grumpy like that. Adam said, yes, you show him your boobs, he'll be fine. He said, if I show him mine, he'll probably kick my ass, but if you show him yours, he'll be nice to you.

Q. All right. Who was the loader y'all were talking about; do you remember his name?

A. It was an older guy. He's really old. I don't know his name. All he did was load the machine.

Q. That's fine. Earlier I mentioned if things come to you -- and usually it's names. So if one of these people's names pop into your head while we're here, just shout it out.

A. Okay.

Q. So older guy was grumpy. You are telling Connie. Why were you telling Connie?

A. We were just driver talking. She's been there for quite sometime, and I just felt comfortable talking to her.

Q. And it's a female driver?

A. Yes, because Miss Connie said that he always complained, and he was saying that we were kicking up dust when we drive through the lot.

Q. Had this older guy complained about you kicking up dust?

Page 55

A. Yes, me and other drivers.

Q. Was he on an open station loader of some sort?

A. Yes, he was on a loader machine.

Q. All right. Do you know when -- I should have asked this. When was Incident No. 1, if you can tell me, and when was Incident No. 2?

A. I don't know exact date.

Q. All right. And what about just relative dates, like in relation to when you started versus in relation to when you ended, and were those close in time or spread apart?

A. They were maybe a week or so apart. Maybe two weeks max. It wasn't very far apart.

Q. And in relation to -- well, we can -- in relation to your separation at the end of July, when, if you can tell me, would it have occurred in relation to that? You've got maybe May --

A. That happened around May. Yeah.

Q. -- all of June, most of July.

A. Yeah. I want to say that last incident about the boobs happened more towards the beginning of July.

Q. So the other one with Adam before that on the leggings, that would have been prior to that?

Page 56

A. Yes.

Q. And you think one to two weeks max prior?

A. Yeah. It wasn't very far apart. I'm not really sure on the time frame.

Q. And present for the boobs comment Connie and Adam. Let me make sure I've got as best you can say what Adam said, and you said, showing your boobs he'll be nice to you; if I show him mine, he'll probably kick my ass?

A. Uh-huh.

Q. Okay. Is that pretty close to what he said?

A. Yeah.

Q. Did I miss anything?

A. Not that I can recall.

Q. All right. Was this another attempt at humor, or do you know?

A. I found it very offensive.

Q. I know, but did anybody else laugh, or what was the reaction of the others?

A. Miss Connie just shook her head and said, no, no, she's not going to do that. And I said, no, Miss Connie, no, and I walked away.

Q. How old is Miss Connie?

A. Miss Connie, I'm not sure, but I'm going to guess late 50s.

Page 57

Q. Have we covered all of the conduct that occurred in the second instance with Adam?

A. Yes.

Q. Okay. Are there any other instances involving Adam? We've got the leggings incident, we've got the boobs incident. Is there anything else that he did that was inappropriate to you for which you think you're entitled to money?

A. Not to my knowledge -- not that I can recall at the time, no.

Q. Okay. So for total events, I've got three so far. We've got the Babbitt guy griping at you about the window, and then Adam 1 and Adam 2. Are there any other events that you viewed were unlawful?

A. The day that we had a cookout, only about four of us black employees, we were the last to eat. Other than that, I can't really think of anything right off the bat with Adam or -- no.

Q. Okay. So I've never -- you submitted a lot of stuff in paperwork and in the discovery, in particular through your lawyers. I don't remember seeing anything about a cookout. What are you talking about there?

A. They gave us a cookout one time while I was

Page 58

there during that short period of time, and I just remember that the blacks being the last ones to kind of eat.

Q. Okay. Was there anybody that said you couldn't go eat until the end?

A. No.

Q. Let's talk about the text message that you guys produced, and I've got a copy as well. That was the -- I'll show it to you. I tell you what I'm going to do, I'm probably going to use mine, so y'all produced it, we produced it, and there's a bates numbers at the bottom.

MR. ROBERTSON: That's y'all.

Q. And yours is produced as Robinson 26 if you look at the bottom, but it's cut off.

A. Okay.

Q. And we've produced it as JARE 0051 and 52. I'm going to show you that one as well. And do you recognize the two text messages as basically being the same, and look at the second page on JARE, too?

A. Yes.

Q. Okay. So with your permission, I'm just going to use the longer, the two-page one from JARE since we know they're the same.

Page 59

(Deposition Exhibit No. 2 was marked.)

Q. All right. You have Exhibit 2 in front of you, and this is just I guess the most complete of the two that we talked about. As far as date stamps, Page 1 appears to perhaps be some instructions on various jobs, correct?

A. Yes.

Q. Go to Page 2, do you see there's a date stamp there, and it has TR at the top. Do you recognize that as being your email -- or text message? Excuse me.

A. Yes.

Q. All right. And the gray portion is you speaking?

A. Uh-huh.

Q. And the blue portion is Chris Meyer speaking?

A. Yes.

Q. Okay. And we know that there's a date on here, June 12, 2023, and you say to Chris, Hi, Chris. This is one of your employees, Tiffany. Can you give me a call at your convenience, thanks?

A. Yes.

Q. And then I'll represent to you the rest just

Page 60

goes back to job instructions. All right. So what I want to do is focus on June 12, and I'm presuming this is the Babbitt complaint; is that true?

A. Yes.

Q. Okay. So did you have a verbal conversation with Chris on June 12 after you sent him this text message?

A. Yes. Once I sent him that text, he called me that evening.

Q. And what was said?

A. I told Chris that I didn't like how Babbitt had spoken to me, that he was speaking to me as if I was one of his children. He was yelling and cursing at me, and I told Chris that I would not accept being talked to like that. I understand Babbitt is the GM, but we're all adults, and there's a way to communicate in a professional manner.

Q. Did he agree with you?

A. He said, yes, I agree. He said, I'm going to talk to Babbitt about it, and I'll see you in the morning.

Q. Obviously you weren't present when he spoke with Babbitt?

Phatiffinia Robinson v.
James A. Rogers Excavating, Inc.

Phatiffinia Robinson
September 26, 2025

Page 61

A. No, I was not.

Q. Did you talk to Chris anymore about the Babbitt incident?

A. Chris never said another word about it. That morning when we came in, John came and said we have a meeting. We all went to the shed where they have the meetings, and Chris just said, when y'all go out on the yard, make sure your windows are all the way down, not halfway down, all the way down. So basically I feel like we got lectured and nothing happened to Babbitt.

Q. Well, but what that also tells us is that he must have talked to Babbitt about the window issue, right?

A. My window was down.

Q. I don't know if it was or it wasn't, but doesn't it indicate to you that he talked to Babbitt and heard whatever he was complaining about is what --

A. No.

Q. You don't know that?

A. No.

Q. So Babbitt is getting onto you about not rolling your window down, not listening. You report to Chris --

Page 62

A. Babbitt --

Q. Let me finish my question. You report to Chris that Babbitt spoke unprofessionally to you. He said he would talk to Babbitt. The next thing you know you have a meeting the next day, and Chris tells all drivers make sure your windows are down all the way, and do you -- you don't agree with me that that indicates he at least had a conversation with Babbitt?

A. He may have had some conversation with him, but it wasn't in regards to the respect of his drivers.

Q. Okay. Well, you weren't there for the conversation, were you, with Babbitt?

A. Nobody was but them two, I'm assuming.

Q. Okay. And if Chris had to get on to you about something, would you expect him not to disclose that to the other workers?

A. I don't know.

Q. Well, you wouldn't have liked it if he had, would you?

A. I don't know.

Q. All right. So outside of that communication, the call that night and then the meeting the next day about leaving the windows down, is there

Page 63

anything else that you attribute to the Babbitt event?

A. Babbitt was mean and he was a racist.

Q. Well, that's not anywhere in your paperwork. We have the roll down your window stuff. Why do you conclude that he was mean and that he was a racist?

A. Because he treated the white female drivers different from the way he treated me.

Q. How?

A. He was just nicer to them, more welcoming.

Q. And you're going to have to give me specifics, not conclusions. Why do you conclude that he was nicer to the white female drivers?

A. Just the conversation, the things that he would say, the nice tone of voice versus yelling and screaming.

Q. So he didn't yell at them and he did yell at you?

A. Yes.

Q. Okay. But as you sit here today, can you identify any instances in which he yelled at you where you can remember what he said other than the one that we've already covered about roll down your window?

Page 64

A. Not word for word, but there's some other incidents where I've had to work with him on jobs and he's been rude.

Q. Okay. In what way?

A. I just explained that, the things that he would say, the tone of voice that he would use.

Q. Well, and this is the closure stuff. We've got to get all the detail out, not the conclusions. So you've described tone, that he had a harsh tone, but as far as the words he uttered outside of the one event about rolling down your window, do you remember any other words that he uttered that you deemed to be rude or inappropriate?

A. Yes. When he told John that Adam would take care of my ass.

Q. And we've covered that. Anything else?

A. Not at this time.

Q. Is the Babbitt incident the only one you reported to Chris?

A. That day when Chris called, I told him that, about the way Babbitt was speaking to me, and I also told him that Adam had made a comment that I found offensive.

Q. Okay. So is that on the same call June 12?

Page 65

A. Yes.

Q. Okay. And tell me what -- did you tell him what the comment was?

A. No.

Q. You just said Adam made an offensive comment?

A. No.

Q. And didn't give him any other information?

A. No. He said we will talk about it, and then he -- he never discussed it.

Q. Okay. What was the offensive statement that you were thinking of that you didn't tell him about?

A. What I told you earlier about what Adam said about the leggings and all that other stuff.

Q. Okay. So the legging incident had already occurred by June 12?

A. I believe so. It all ran together. They all happened within a week to two weeks time frame.

Q. So was the Adam 1 and Adam 2, Adam 1 is the legging incident, we can see your ass from a mile away if you wear those, or something like that?

A. (Witness nodding head up and down.)

Q. Adam 2 event is the showing your boobs comment?

A. Uh-huh.

Page 66

Q. And again, this is the time frame. We know now from your testimony that the legging event was before June 12 since you said he made a rude comment?

A. (Witness nodding head up and down.)

Q. Do you know when, in light of this text message, the show him your booby comment would have occurred?

A. I don't.

Q. Would it have been within a week or two of June 12th?

A. Possible.

Q. Have we covered all of the comments that were of a sexual nature toward you while working at James A. Rogers Excavating?

A. Yes.

Q. Okay. Did anybody make any racial comments toward you?

A. Not that I can recall.

Q. Okay. And none have been reported in the paperwork. We're getting back to the time line at the termination. You have the conversation at the WalMart parking lot, he said go back to the office?

A. Okay.

Page 67

Q. Did you drive straight back to the office?

A. I did.

Q. Were you in a dump truck?

A. I was.

Q. You pull into the shop with the dump truck. What happens next?

A. I pulled into the shop with the dump truck. I started pumping in the gas. Right after that Adam pulled in. He gets out of the truck, he walks over to me and he says, hey, Tiffany, I need to talk for a second. I say, hey, what's up, Adam. He said, today is going to be your last day. I said, okay, why, what happened. He said, well, we're cutting drivers short; we don't have as many jobs as we used to have, so we don't need as many drivers, and so we're terminating the newest driver. I said, well, Adam, I'm not the newest driver. I said, as a matter of fact, like Quinton came after me, and then they had rehired another guy that was a former worker, he had came after me, so how am I the newest driver. He said, well, I don't know, that's just what Chris told me to do. He said, I got the truck from here, and I said, okay, thank you, and I got my stuff and I left.

Page 68

Q. So your personal vehicle would have been there?

A. Yes, it was.

Q. Did you have to go back and get your final paycheck or any belongings or anything like that?

A. No. It was direct deposit.

Q. Did you have any -- well, have we covered everything that you can recall about the conversation regarding your separation? And stated another way, did he say anything else?

A. No.

Q. So have we covered everything about the words that were uttered concerning your termination?

A. Yes.

Q. Okay. Do you know who Chris would have discussed who to select for the termination? Do you know anything at all about that?

A. I don't.

Q. Have you had any conversations with Chris since you left the company?

A. I have not.

Q. You identified a couple of guys. Brian, and is it Quinton?

A. Uh-huh. Yes.

Q. That you talked to afterwards?

Phatiffinia Robinson v.
James A. Rogers Excavating, Inc.

Phatiffinia Robinson
September 26, 2025

Page 69

A. Yes.

Q. Other than those two, are those the only two former JARE employees that you talked to?

A. Yes. Brian, Quinton and John, those are the only people that I --

Q. Brian, Quinton and John?

A. Yes.

Q. Do you know if any of them are still there, if you know?

A. I'm not sure.

Q. All right. The other driver that was -- that came in after you, was that Vick Norman?

A. Yes.

Q. Okay. Is Vick white or black?

A. He's black.

Q. And Quinton is black?

A. Yes.

Q. Okay. Somewhere -- all right. Was Jamal Cathey driving when you were there?

A. I don't know who Jamal is.

Q. All right. Well, there's a list of employees that were provided to the EEOC of the other drivers. There's Jamal Cathey, a black male, Connie Lambert, white female, and I'm assuming that's Miss Connie?

Page 70

A. Yes.

Q. Melanie Laster, white female. Do you know Melanie?

A. Yes.

Q. Carol Luck, white female, do you remember her?

A. Yes.

Q. Brian Morris, that's got to be Brian that you've been talking about?

A. Yes.

Q. Vick Norman, Wayne Smith?

A. Yes.

Q. Another guy, John Tyler. Do you remember a John Tyler?

A. I don't know John's last name.

Q. Okay. He actually may not have been there when you were there the way this report is written. But you've got ballpark eight drivers total driving dump trucks, if you remember?

A. That sounds about right. I'm not sure.

Q. And of those you've got three female drivers, three out of eight, four if you count you?

A. Yes.

Q. And it looks like there were -- counting you, there would have been four black drivers, four

Page 71

white drivers. Does that sound right?

A. Possible. I'm not really sure.

Q. Do you typically see a split like that where it's basically 50/50 male versus female in truck drivers?

A. It can vary.

Q. It can vary. Well, I'm from the outside of the industry, and I just thought it would be completely dominated by men. Maybe that's just foolish on my part. But is it common in your experience to have, you know, half the drivers being female?

A. It's possible.

Q. Do you know?

A. I don't.

Q. Let's talk about after you left. Where did you -- did you draw unemployment?

A. No.

Q. Okay. Did you apply?

A. No.

Q. You didn't apply?

A. No.

Q. Did you get a job quickly?

A. No, I did not.

Q. Why didn't you apply for unemployment?

Page 72

A. I couldn't find a job. I was applying for jobs. I didn't want unemployment. I wanted to get a job, and I could not find a job. I was applying.

Q. All right. Is there any particular reason why you did not apply for unemployment?

A. Well, I did go down there, and I did fill out the paperwork, and it was only like -- it wasn't that much. It was better to try to find a job.

Q. Do you know if they actually denied it for any reason?

A. I'm not sure.

Q. And I don't know if you have to work for a certain amount of time before you get it or not. I don't know what the rules are.

A. I'm not sure.

Q. You applied. You don't know what happened to it. You just started looking for a job?

A. Yes.

Q. And then if I misstate something, just because I'm trying to speed along, stop me and just correct me, okay?

A. Okay.

Q. So do you remember the types of jobs you applied for after James A. Rogers?

Page 73

A. I applied for driving jobs, customer service, just any type of job that I could find that I had experience in.

Q. Were all of these through Indeed?

A. Yes.

Q. Did you use any other platform?

A. Not that I can remember.

Q. What was your first job after leaving James A. Rogers?

A. I didn't get a job for -- gosh -- eight, nine months after, and I finally got a job at Canteen.

Q. Where?

A. Canteen.

Q. Canteen. Who was supporting you financially during this eight or nine-month period?

A. Family assistance, my ex-husband.

Q. Were you guys living together at the time?

A. No.

Q. What is Canteen?

A. It's a vending company.

Q. What did you do there?

A. I drove a truck on delivery routes.

Q. What size truck?

A. A box truck.

Q. Like -- do you have to have a CDL to drive

Page 74

that kind of truck?

A. No, no, you don't need a CDL for this.

Q. Like a U-Haul kind of truck?

A. Similar, yes.

Q. And what was your pay rate at Canteen? I think it's in your discovery actually.

A. I'm not sure.

Q. Let me see if I can find it. If you remember, just shout it out, but I'm pretty sure I remember seeing it in here. Let me see if I can find it. 19.80 an hour, and then a raise to $20 an hour. Page 9 of 15 in your discovery responses you discuss Canteen, starting pay was 19.80 per hour, and around September or October of '24 I received a raise to $20 an hour. This is a full-time position. Is that true?

A. Yes.

Q. So a little more than $1 an hour than what you were making at James A. Rogers. How long did you work at Canteen?

A. I worked for Canteen for 10 to 11 months.

Q. And why did you leave?

A. Just too much wear and tear on my body.

Q. Did you quit or were you fired?

A. I quit.

Page 75

Q. Did you give notice?

A. I did.

Q. And did you have another job lined up before quitting?

A. No.

Q. And how long were you off before you got your next job?

A. Like two months.

Q. How did you support yourself in that two-month window?

A. Family.

Q. Ex-husband and family?

A. Yes.

Q. What was your next job?

A. After Canteen, I did drive dump trucks for a gentleman that had his own personal company. He only had about two or three dump trucks. I drove for him for two weeks max.

Q. Who was that?

A. I don't even remember the guy's name.

Q. Okay. When was that you did this two-week --

A. That was in August.

Q. Of '24 or '25?

A. This year.

Q. This year?

Page 76

A. Yes.

Q. Okay. So a month ago?

A. Yes.

Q. Okay. And what was your reason for leaving that guy?

A. I didn't -- it was just a small company. I didn't like how it was set up.

Q. What did you not like about it?

A. Because it wasn't really -- it's like his own personal business. This is really just a guy that owned a couple of trucks. It wasn't a legit job -- it was legit, but it wasn't like a real job, a corporation or anything like that.

Q. Okay. That was Louis Austin?

A. Yes.

Q. He's actually like one of the best dirt guys here, isn't he?

A. If that's what you want to say.

Q. Well, he actually did work for one of my partners, that's why.

A. Well, that's fine.

Q. Yeah. Did you have any problems with Louis?

A. No.

Q. You quit?

A. I did. I resigned.

Page 77

Q. And did you resign with notice?

A. I did. I even signed a resignation form.

Q. So after Louis, where did you go to work?

A. I didn't.

Q. Is the nursing rehab your next job?

A. Yes.

Q. All right. So truck driving jobs, we've got USA Truck, Redstone, James A. Rogers Excavating, Canteen, if you will, and Louis Austin. Is that everybody?

A. Yes.

Q. Let's talk about your charges. This is the EEOC charge. I want to show you next your complaint you filed with the EEOC. We're going to cover some timing issues which are always important for lawyers. I'm going to show you what's marked as Exhibit 3. Do you recognize that document?

(Deposition Exhibit No. 3 was marked.)

A. I've never seen the document, but I know I contacted the EEOC.

Q. You can see at the bottom it says digitally signed by you?

A. Yes.

Page 78

Q. And it says signed January 9, 2024?

A. Yes.

Q. Is that consistent with your recollection of when you would have filed your charge with the EEOC?

A. Yes.

Q. And I know it's -- you know, in the old days we got handwritten documents with handwritten signatures, but it's all digital, I think a lot due to COVID, but you can see there's a couple of areas that I want to talk about. On the front page, it has the particulars, which are just the allegations. Do you see where I'm talking about?

A. Yes, I see that.

Q. And I don't have to -- I mean, did you provide that information to the EEOC?

A. Yes.

Q. All right. And it says you were hired on May 16, and then June 12 you filed a complaint with the owner. That's the text message that we've discussed, correct?

A. Yes.

Q. All right. You said regarding sex and race discrimination, but if you look right above that when it has the claims being made, it only says

Page 79

retaliation and sex, it doesn't say race?

A. Yes, but I didn't type this up. When they called me, I told them my side and they typed it, so I'm not sure how they worded it or how they put it.

Q. Right. And that happens a lot, and everybody is human. So what I've got to do is basically find out what is really an issue and what's not. My impression is that race is really not an issue in this lawsuit, but because that word is listed there I have to ask you if it is. I have not gotten the impression today that you're making a claim based on race, nor is it in your current complaint which we'll cover in a minute. Is the introduction of the word race in the EEOC charge here just a typo?

A. No.

Q. Okay. Were you complaining about racial treatment?

A. I feel because I was a black female that I was treated differently, so if me being black plays a part in it, then yes.

Q. Okay. Have we covered all facts today, to your knowledge, that would support a claim for race based discrimination, or is there something

Page 80

else we need to cover?

A. Based on me being a black female, yes.

Q. Are there any events that occurred that lead you to conclude that you were treated differently based on race?

A. Being a black female, yes.

Q. Well, I'm a bald-headed white guy. If I walk into a room and people look at me, I may conclude they're looking at me because I'm bald, but they may not be. They may just be looking at me. So I need to know the facts that support the conclusion you have that you were treated differently based on race?

A. Okay.

Q. If you have any. I mean, this is a closure question. We've got to know it all before trial.

A. Yes, I was treated differently because of my race. I was terminated because I was a black female. I've never had any incidents at James A. Rogers, and I was terminated when they had two other white females, Melanie and the other lady that you named, that had multiple accidents in the dump trucks, and they were never penalized. I never had an accident, and yet I was the one that was terminated.

Page 81

Q. Okay. How long had the other female drivers been there?

A. They had been there longer than me, but I've never had an accident, I've never cost the company money.

Q. Okay. Is there anything else that you rely on for the conclusion that you were treated differently based on your race?

A. Other than me being terminated, no.

Q. Okay. Next it says, in mid July I was subjected to sexual harassment. Is that Adam comment 1 or Adam comment 2 you're referring to, if you remember?

A. I didn't write the word subjective. That's what the EEOC wrote down. I told them what happened, and how they worded it was up to them.

Q. Ultimately the EEOC issued the notice and Right to Sue, the letter that said you could file a lawsuit?

A. Correct.

Q. I'm showing you Exhibit No. 4. Do you recognize that as the notice and Right to Sue letter?

(Deposition Exhibit No. 4 was marked.)

Page 82

A. Yes.

Q. And that was issued on September 5, 2024, correct?

A. That's the date that it has, yes.

Q. So by that time had the EEOC told you that they were not going to pursue the charge against James A. Rogers Excavating?

A. Well, at that time -- I'm not sure which one came first. I don't know if this came before or after, but I was offered $1,000, which I declined. Then I received another offer for $5,000 which I declined. After that I got the Right to Sue letter.

Q. Okay. Are you referring to the confidential negotiations that occurred during the mediation process?

A. Yes, I am.

Q. All right. You received that letter -- tell me that date again. September 5, 2024, and you filed your complaint in federal court on October 8, correct?

A. Yes.

Q. All right. I'm showing you what's marked as Exhibit 5 to your deposition, which is your complaint, correct?

Page 83

(Deposition Exhibit No. 5 was marked.)

A. Yes.

Q. Exhibit 5 is the pleading you filed in federal court, or your lawyer filed for you, correct?

A. Yes.

Q. Did you read this document before it was filed?

A. Yes.

Q. Did you approve it?

A. Yes.

Q. All right. The lawsuit does not allege race based claims, correct?

A. Discriminated based on sex. This is what I just read.

Q. Right. Yeah. Sex based on hostile work environment it appears and equal pay issues, and we're going to cover all those in a minute, but I didn't see anything in here about sex and I didn't see anything in here about retaliation. Do you agree with me that those claims are not in your complaint, correct?

A. Based on what I reviewed, I don't see that here. I haven't read all the way through that.

Page 84

Q. Well, I didn't see it either.

A. But that's what happened to me, though. That's what happened.

Q. Okay. How were you retaliated against?

A. Once I made the complaint to Chris about Babbitt, once I called him out, I was just nitpicked with until I was terminated. That's why the day that I was terminated Babbitt said, Chris is going to handle -- I mean Adam is going to handle her.

Q. How were you nitpicked?

A. The way people nitpicked at jobs. I mean, like if they know you're going to get gas, they'll hang it up instead of leaving the lever out like they leave it out for a driver after. Just small things that can occur. Once I made the complaint I was terminated.

Q. Who left the gas lever out, and was that just to annoy you or something?

A. Yes, things like that.

Q. Okay. Who did that, do you know? Who did the lever thing, who did that that annoyed you?

A. You mean like who left the gas lever out?

Q. Yes. So this on the -- this is back on we've got to know the facts of actually what happened

Page 85

as opposed to the conclusion.

A. Right.

Q. So when I asked about nitpicking, you said someone left the gas lever out?

A. Yes. They would leave the gas lever out, one of the white female drivers. I don't know her name. Like when I would come up on the job, they would just snicker and laugh like high school kids nitpicking.

Q. You don't know who the white female driver was?

A. One of the ladies you named earlier.

Q. Okay. Do you know which one it is?

A. The heavyset one. I don't know her name.

Q. Fair enough. Is there anything else like that that you deemed was retaliatory, and if so, who did it?

A. Other than when I made the complaint to Chris about Babbitt, I was terminated shortly after, and that's all I can think of.

Q. Well, that was a month and a half later. You made the report on June 12, and you got to near the end of July?

A. Yes, I made the report on June 12 that I was being mistreated by Babbitt. A couple of weeks

Page 86

after that, they -- it was all like a plan I believe. A couple weeks after that, that's when they hired the guy that came back.

Q. Vick Norman?

A. Vick, yes. Two weeks max after Vick was -- two to three weeks after Vick was there, I was terminated. Once I was terminated, Vick was in my truck.

Q. Do you know what else Vick did for the company?

A. He was driving a water truck up until they terminated me, and I saw him driving the truck that I was once in.

Q. When did you see Vick driving that truck?

A. Well, the company is in Otter Creek, and my mom lives out there, so it may have been like a week or two after I was terminated.

Q. Which street in Otter Creek?

A. The main road Otter Creek.

Q. On the parkway?

A. Yes.

Q. So you had some photos that were -- they were of trucks that you guys produced in discovery?

A. Uh-huh.

Q. Was there a reason why you took those

Page 87

photographs?

A. Yes. To show that I was retaliated against. They knew that they were going to fire me once I made that complaint about Babbitt, and that's the guy in the truck that I was driving.

Q. Okay. So there's -- you took those photographs of a red dump truck just because that's the truck you used to drive and somebody else was in it; is that true?

A. If that's how you want to word it.

Q. Well, I mean, you took the photos. Let me go ahead and mark them --

A. I did.

Q. -- as 6 and 7, and they were produced under bates number Robinson 22 and Robinson 23.

(Deposition Exhibit Nos. 6 and 7 were marked.)

MR. ROBERTSON: I didn't make extra copies.

Q. All right. So the photographs that are marked as Exhibit 6 and 7, you took those two photographs?

A. Uh-huh.

Q. Because that was the truck you once drove, and somebody else was driving it?

Page 88

A. No, not because of that. To show that I was plotted and retaliated against, that they had already had it orchestrated that they were going to fire me, and they hired Vick, and they were going to put him in my truck once I made the complaints about Babbitt, and Babbitt was the GM, and also, I'm assuming a member, a close friend or a member of the family and they no longer wanted me there, because me and Babbitt didn't see eye to eye. So the pictures of me taking of him and the truck just showed that I was retaliated against, and they had already had that orchestrated that they were going to have that guy as my replacement.

Q. Okay. Can you tell who's driving that truck?

A. Yeah. That's Vick. I seen him. I know what he looks like.

Q. All right. And how do you know that was the truck you were driving?

A. Because he's black and he has dreads.

Q. Well, how do we know that was the truck you were driving?

A. Because that's the only red trotter that they had.

Q. That's the only what?

Page 89

A. Dump truck that they had.

Q. There's a number that would show, wouldn't it?

A. Yeah, but I don't see the number in the picture.

Q. Yeah. On either one I don't see it. When did you take these photos?

A. Not too long after I was terminated, a week or two.

Q. Do you still have them in your phone where you could pull them up and look at the date?

A. I don't.

Q. Well, did you take them with your phone?

A. I did.

Q. Now, you said you think that Babbitt was part of the family and that you were being fired because you ratted him out or something like that?

A. (Witness nodding head up and down.)

Q. And I need to know why you think that. What evidence do you have to support that conclusion?

A. The way that I was treated.

Q. Did someone say anything to you about that?

A. Yes. Everything that we've been discussing. What do you mean?

Page 90

Q. Well, if there's something new that I haven't heard yet --

A. Oh, no.

Q. Have we covered everything? You have to say it out loud for the court reporter.

A. Yes.

Q. Again, I'm not trying to be rude, but when you nod your head like that, she can't type it down. So you had the only red truck.

MADAM COURT REPORTER: I'm going to change tapes real quick.

(A break was taken.)

(Back on the record.)

Q. (By Mr. Robertson) All right. We are back on the record after a very brief break, and we were looking at Exhibit 5 which is the complaint. There's some jurisdictional stuff at the beginning. Go down to Paragraph 22, and your allegation there is that you made 18.50 per hour, however, men in the same role earned $21 per hour, and to whom were you referring?

A. Well, I know Quinton was making 21, he told me that himself.

Q. What was Quinton's job?

A. He was a driver.

Page 91

Q. Did you drive anything other than the dump truck?

A. No.

Q. Did he drive anything other than the dump truck?

A. No.

Q. He didn't pull equipment?

A. Not the whole time I was there, never pulled equipment. He was running the same route.

Q. You produced some recordings in the lawsuit?

A. Uh-huh.

Q. Do you remember doing that?

A. Yes.

Q. And one of these was of Quinton?

A. Yes.

Q. And do you remember Quinton discussing how he had to do all of Adam's hauling for him?

A. That must have been after I left. During the time that I was there, Quinton was only driving a dump truck. He wasn't pulling or hauling anything.

Q. Okay. Did you ever -- well, were you aware that he was hired to haul equipment?

A. No. He told me he was hired as a driver.

Q. But you have the recording where he said he's

Page 92

hauling equipment for Adam?

A. This was after I left. I asked him why did he leave the job. He said, man, I quit because Adam had me doing all of his work is what he said in the recording.

Q. Meaning Adam's job was also to make sure the equipment got from Point A to Point B?

A. I wasn't there. I'm not sure.

Q. Okay. So you don't know all of the responsibilities that Quinton had, correct?

A. All I know, is that while I was there, he only drove a dump truck. He never hauled any other type of equipment.

Q. That you saw?

A. That I saw during the time that we worked together, which was Monday through Friday.

Q. And you have a recording where he describes hauling equipment?

A. That must have been after I was already terminated.

Q. Do you know how long he had been a driver?

A. I do not.

Q. Let's talk about Vick Norman. Do you know how long he had been a driver?

A. I don't know anything about Vick.

Page 93

Q. Did you know Vick had been there at the company previously?

A. I did know that part, yes.

Q. Do you know how long he had worked at the company previously?

A. No, I did not.

Q. You mentioned Vick drives tanker trucks for the company?

A. I don't know that.

Q. All right. Do you have any endorsements to drive a tanker?

A. With my endorsement I -- a tanker, you have to have a hazmat. I said Vick drove a water truck. I don't know about a tanker. You don't need --

Q. Well, that's poor language on my part because I don't know your business. All right. But the fluid hauling equipment --

A. For a water truck, you do not need any type of endorsement.

Q. Okay. If you take a water truck on a highway do you need an endorsement?

A. No. Well, you need a Class A. You need a CDL.

Q. It's your understanding, though, that

Page 94

Mr. Vick Norman drove the water truck?

A. I've driven the water truck when my truck was down once.

Q. Was it your job to drive the water truck --

A. That day -- no.

Q. Let me finish. Was it your job to drive the water truck day in and day out?

A. As I stated, no, because that particular day my truck as down.

Q. Why are you getting mad at me?

A. I am not getting mad. Why are you getting offensive?

Q. I'm not getting offensive. You're glaring at me, your tone has changed.

A. I'm making eye contact with you.

Q. Well, let's talk about Mr. Norman's pay. Do you have any idea what that was?

A. I do not.

Q. Other than potentially Quinton and Mr. Norman, do you contend there were any other males who were treated more favorably than you?

A. Not to my knowledge. Not that I can think of.

Q. Okay. You don't know Norman's pay. Quinton told you he made 21 an hour?

Page 95

A. Correct.

Q. All right. Do you know when Quinton left?

A. I do not.

Q. Do you know why he left?

A. I do not.

Q. Do you know where he went for work?

A. I do not.

Q. Do you know where he lives, what city?

A. No. The last time we talked he lived in Benton, but I'm not sure.

Q. Do you remember a driver named Phillip Tompkins?

A. With Rogers?

Q. Yes.

A. No.

Q. Do you remember a driver named Brandon Shelton?

A. No.

Q. Do you remember a driver named Jacob Archer?

A. No.

Q. Were you aware that those were male drivers that made less than you?

A. I've never heard of them.

Q. You don't know?

A. No. I don't believe they were there when I

Page 96

was.

Q. Did you tell the EEOC that you were only making $17.50 an hour?

A. I told her that I wasn't sure, 17, 18, somewhere up in there.

Q. But you did know, didn't you?

A. No, I didn't.

Q. You didn't know how much you were making an hour by this time?

A. I did not know for sure. I didn't know if it was 17.50 or 18.50.

Q. Did you get pay stubs with your pay?

A. No. It just went direct deposit.

Q. Well, at the end of the year, you would have been given pay records, right?

A. I didn't receive those. What do you mean, a W-2?

Q. Yeah. You get your W-2s, 1099s, all of that at the end of the year. You got those records?

A. Yes.

Q. Do you still have them?

A. No.

Q. All right. Are you contending that -- you have an allegation in here for equal pay, meaning you believe somebody similarly situated to you, a

Page 97

male, received more pay for the same job; is that your understanding?

A. Yes. As well as the white females, they received more pay as well.

Q. Okay. Well, race is not alleged. So right now we're focused on -- and equal pay doesn't apply to race. It applies to the equal pay male versus female. All right. So with respect to the males you contend who did your job who were paid more, are you referring to just Quinton and Vick Norman?

A. Any male that was paid more than me.

Q. Okay. Well, it's your obligation to identify whoever similarly situated who was paid more, so that's what you've got to do today. Who do you contend was similarly situated to you and was paid more money than you, males?

A. The two that you named.

Q. Okay. And do you contend anybody else?

A. The two females that I named.

Q. Okay. And you think that's now based on race?

A. I'm not sure what it was based on, but they didn't have as much experience as me.

Q. Are you talking about the females who were

Page 98

hired before you?

A. Yes.

Q. And do you know their names?

A. Melanie and Melanie's girlfriend.

Q. Melody or Melanie?

A. M-e, d, I'm not sure.

Q. All right. Let me look at the names again. All right. There's a Melanie Laster with an N. Melanie. Connie Lambert, Carol Luck?

A. Carol and Melanie.

Q. Okay. You're saying two white females who were treated more favorably than you on pay. Do you know what they made an hour?

A. They made more than me. I remember talking to Melanie about it. We've had a couple of conversations.

Q. And do you know how many years each of them had been employed at the company longer than you?

A. No.

Q. You don't know when either one of them started?

A. Melanie said that she had been there for maybe about six to eight months I believe. I'm not sure, but she told me she had came with no experience.

Page 99

Q. Well, she had to have her CDL to drive a truck, right?

A. Yes. It was her first driving job from my understanding.

Q. And do you know what Carol Luck's experience was?

A. I do not know. I just know that both of those women were operating James A. Rogers vehicles, and both of them had very bad accidents in them on more than one occasion with one driver.

Q. All right. Were you present when those accidents occurred?

A. One of them I was with the company.

Q. Did you see it?

A. No.

Q. Okay. Do you know who made the decisions concerning the pay structure for the drivers?

A. No.

Q. So on race, you have not alleged in the complaint, but if it were there, you're saying that you were treated less favorably than the two white employees, Carol and Melanie. Are there any other white employees that you contend you were treated less favorably than who were

Page 100

similarly situated?

A. No.

Q. Okay. Do you know what damages you're claiming in this case, what money you want?

A. Well, I mean, it's not just about money. I went through a lot with this situation. It caused a lot of emotional distress, mental anguish. I also have a heart condition that I've had since the age of 5. It caused a lot of high blood pressure and stress on my body.

Q. Well, let's take pay. Have you run the math to see how much pay you think you're entitled to?

A. No. I have not even thought about that.

Q. Okay. As you sit here today, do you know how much you think you're entitled to as a result of the conduct that you've described?

A. I mean, I don't like to put a dollar amount on things that I've went through in my life. I can't think of a number right off the top of my head, I can't. I don't know.

Q. Okay. Do you have any intent on telling a jury how much you think you are entitled to recover?

A. I'll have to discuss that with my attorney.

Q. Okay. What categories of damages are you

Page 101

going to ask for, even though you may not know the amount? We've got pay. What else? And you're pulling your phone out to look at notes?

A. Yes, I am.

Q. Okay. That's fine.

A. Lost wages, lost benefits.

Q. Let me pause you. If you're looking at a communication between you and your lawyer --

A. No. This is not between me and my lawyer at all. This is all my information.

Q. All right. Lost wages, and you don't know what that amount would be?

A. No.

Q. And lost benefits, you don't know what that amount would be?

A. No. Job related expenses. Once I was terminated from there, I had to sell my vehicle.

Q. Why do you think you're entitled to getting recovery for your vehicle?

A. Because I didn't have money to pay bills. I had to sell my vehicle in order to survive because of me being terminated.

Q. Have you reviewed whether or not you're entitled to recover for the value of your car in an employment discrimination lawsuit?

Page 102

A. You asked the question. I'm just telling you the answer.

Q. That's fine. You tell me what you know. We'll talk about whether you can do it or not later. Lost wages, lost benefits, value of your car. What else?

A. Emotional distress.

Q. What are you seeking for the car by the way; how much do you want for that? Do you remember?

A. How much did I sell the car for?

Q. Well, I mean, I'm assuming that's what you're trying to claim if you had to --

A. I did have to sell my vehicle.

Q. Are you claiming you're entitled to that amount again, or do you know?

A. I'm just telling you what I went through in order to survive.

Q. Okay. Emotional distress, I assume you don't have a number you can contribute to that today?

A. No.

Q. What else?

A. Punitive damages, because I mean, this is not ethical to treat someone as such.

Q. Are there any other damages that you can think of today that you will be potentially

Page 103

claiming at trial?

A. Everything that I've listed.

Q. Anything else?

A. I've already said emotional stress, health issues, selling my vehicle, downsizing my living space.

Q. Did you have any physical -- do you have any physical conditions that prevent you from doing jobs?

A. No.

Q. Now, you haven't -- you shifted careers to the medical field?

A. Yes.

Q. Do you intend to go back to the driving field?

A. Not at this time.

Q. Is it more in health care? Do you make more money in health care?

A. I do.

Q. What do you have to do to maintain your driver's license -- your professional driver's license?

A. Just go and get my recertification for my meds, my medical recertification every two years.

Q. Okay. When is that coming due?

Page 104

A. It is due I believe -- I believe it's coming up in December, if I'm not mistaken.

Q. And do you intend to keep it active?

A. Yes, I do.

Q. Have you operated any businesses for yourself -- I know you did 10 years ago or something like that -- but since 2023 till today, have you had any other businesses that you've operated individually as opposed to working for someone else?

A. No.

Q. You mentioned -- if I remember correctly, you're saying that you had a toll on your health, but when we asked you that in discovery, I think we asked specifically if you're making a claim for any type of health issue, and we submitted a health verification that you guys declined to sign, which will be appropriate if you're not going to make a health claim. If you are going to make a health claim, then I'm entitled to see your medical records.

MR. ROBERTSON: I'll tell you what I'll do. I'll get you the authorization before we leave today and we'll get her to sign it.

Q. Have you ever been treated for any

Page 105

psychiatric issues?

A. No.

Q. You've never been to a psychologist or a psychiatrist?

A. No.

Q. Do you attend church anywhere?

A. I do.

Q. Where?

A. First Baptist in North Little Rock, Reverend Robinson.

Q. Are you related to him?

A. No, I'm not.

Q. That's on Main Street?

A. Uh-huh.

Q. By the funeral home?

A. Yes.

Q. How long have you gone there?

A. Since I moved back, so about -- I want to say about two years I've been going there.

Q. How frequently do you attend?

A. Every Sunday unless I'm working.

Q. Are you in any Sunday school classes or other groups?

A. No.

Q. Other than attend, do you have any

Page 106

involvement at the church itself?

A. Like we have Bible study on Wednesdays, just the typical things. We have events for the kids, stuff like that, but I'm not a member of a board or anything like that.

Q. Are you in a designated class?

A. No.

Q. In the churches I've grown up with, there would be -- it'd be like the old guys in -- they'd have a name for their class, and then there would be like Searchers or something like that?

A. No.

Q. You're not in any class --

A. Nothing like that, no.

Q. You already said you don't have a leadership position there?

A. No.

Q. And you commute from Bryant to North Little Rock on Sundays for church?

A. I do.

Q. You said you had had no psychiatric treatment, correct?

A. No, I haven't.

Q. You have not sought counseling?

Page 107

A. No.

Q. Have you been to a mental health counselor?

A. No.

Q. Have you ever been a victim of a crime?

A. No.

Q. Has anybody close to you ever been a victim of a crime?

A. No.

Q. How long has your mom been living in Otter Creek?

A. She moved there a little bit after my dad passed. She's been out there about seven or eight years or more.

Q. So she wasn't there. There was a -- when I lived there, there was a lady who got murdered at the front office there. I didn't know if she was still there when that happened. Have you suffered any prior or subsequent race based or gender based discrimination?

A. Outside of James A. Rogers?

Q. Yes, ma'am.

A. No.

Q. I'm skipping through my outline. We've actually covered a lot of this, so just bear with me.

Page 108

A. Uh-huh.

Q. Outside of Mr. Babbitt, do you know of anybody else that complained about your performance or property damage? We talked about the dust control issue on the site with Babbitt. Do you remember anybody else complaining?

A. (Witness nodding head back and forth.)

Q. You shook your head no?

A. No.

Q. How about there was an allegation that you damaged a gate, and Adam Parker --

A. That's what I was getting ready to say. I do remember the EEOC lady calling me asking me something about the gate. I told her what happened that day, was when we were pulling into the gate, the tarp handle, not the gate itself, but the tarp handle on the truck went against the side of the gate. It didn't cause any damage. It didn't tear, dent or ding oro anything. I called Adam and told him, and he said he'll look at it once I'm back to the yard. Once I got back to the yard, Adam said the truck is fine, nothing is wrong with it, and nothing was done. I wasn't written up, I wasn't chastised. There was no damage to the truck. It just scraped the side of

Page 109

the gate, one of those tarp handles, so the tarp still actively worked fine.

Q. So that accident just resulted in paint damage?

A. No, no paint damage. There was no damage at all.

Q. You said a scrape?

A. The tarp handle is metal, so it just kind of put like a little line on it, but there was no damage. It still functioned fine.

Q. Well, you said it was a scrape, and that's why I was wondering. Usually that's a paint scrape, but you're --

A. But it's metal, so it's not paint.

Q. Okay. So what we've got to do next, and we're hopefully winding down. We're going to mark your discovery responses at No. 8. What we -- they're not verified. Normally there's a signature at the back that says these are true and correct to the best of your ability, but since these are not verified, I need you to read over them, and then say under oath today on the record that they're accurate, or if there are changes, then we need to address any changes. So if you'll thumb through those, we can go off the

Page 110

record while you're doing that, take a few minutes to go to the restroom. I'll get the authorization while we're doing that.

(Deposition Exhibit No. 8 was marked.)

(A break was taken.)

(Back on the record.)

Q. (By Mr. Robertson) Okay. We have in front of you what's marked as Exhibit No. 8 which are your discovery responses. Have you had a chance to look through those?

A. I have.

Q. All right. And are there any -- is there anything in Exhibit 8 that you need to change, or are they are still true and correct?

A. Everything is still correct and true.

Q. Okay. Let me -- I'm going to thumb through a few of these things in here and ask some questions. So Page 2 of 15, answer to No. 3 asks for who basically is a potential witness. You identify the Brian who we've talked about, Adam Parker, the older white lady. Is that going to be Connie?

A. Yes.

Q. Quinton, John and DeShaun, your husband --

Page 111

ex-husband?

A. Yes.

Q. Is it my understanding, based on these responses, that DeShaun only knows what you told him; is that correct?

A. Yes.

Q. Okay. Next page, 3 of 15, says you regained employment in June of '24. Wasn't it before that, though, when you went to work for the --

A. For Canteen?

Q. Yeah.

A. I want to say it was around May or June of '24.

Q. Well, we'll try and get there --

A. I believe it was June. I think it was June 24th was my start date actually. I have it in my phone.

Q. Okay. There are recordings. There's three recordings you guys produced. Do you remember -- one of them was Quinton for sure?

A. Yeah.

Q. I'm trying to remember the others.

A. John and Brian.

Q. John and Brian?

A. Uh-huh.

Page 112

Q. Do you have any recordings of Adam Parker?

A. No.

Q. Do you have any recordings of Chris or Ken Meyer?

A. No.

Q. Are those the only three recordings you have of any employee of James A. Rogers?

A. Yes, because I could not find Miss Connie's number, but yes.

Q. You've answered that. You did say June of '24. Do you have any of your pay records from Canteen?

A. I don't.

Q. Okay. Will you please look, and if you find them, get them to Sean for me, please?

A. I will.

Q. And I'm looking in particular at Response to Request for Production No. 9 on Page 12 of 15 where we're basically asking for the post employment -- well, preemployment and post employment wage records. I'm more interested in the wage records after you left James A. Rogers. There is another text that is not on its face identifiable. We're on 9.

A. Uh-huh.

Page 113

Q. And you've bates labeled it as Robinson 25. We're marking that document as Exhibit 9 to your deposition, and this is a single page of a text with a 985 area code number. Who is this that you're communicating with?

(Deposition Exhibit No. 9 was marked.)

A. This is Quinton.

Q. So the 985 number is Quinton's?

A. Yes, correct.

Q. Are you blue or gray in the --

A. I'm blue.

Q. So you still a racist Rogers. You're asking that to Quinton --

A. It was supposed to say at. I was asking him was he still employed at the racist company Rogers, yes.

Q. So it's just a typo then?

A. Yes, it was a typo. He said no, LOL, no indeed, meaning no, I'm not. He said, I left maybe two to three weeks after you did. I said, dang, LOL, what happened. He said, I went to doing the heavy haul. And this kind of goes back to what I stated earlier. He wasn't hauling anything while I was there, and that's what he

Page 114

states in this sentence. I went to doing the heavy haul, and my pay was supposed to go up and never did. Then Adam was basically --

Q. Whoa, whoa, whoa. You're not reading verbatim. I mean, I can read it myself verbatim, but if you're saying he said something in addition to that, I want to cover it, or if you are reading verbatim --

A. I am reading verbatim.

Q. Okay. Then one of us got off track there.

A. I'm in the gray paragraph in the middle.

Q. I see it.

A. But basically --

Q. That's sad asf. I gotcha.

A. Yeah, that's me talking to him. I said, that's sad as fuck. They've been on bull crap, and Adam, he's a fat pervert. And then that's when he's talking about what he's doing, and that's when I was talking about what I was doing.

Q. So he went to work for another company at $27 an hour?

A. Uh-huh.

Q. But this makes it look like he quit there. Is that how you read it?

A. Yes, he did say he quit. He said he left two

Page 115

to three weeks after I did, because he went to doing heavy haul, and the pay was supposed to go up, and they never upped his pay, just like they terminated me before my 90-day mark before I could get my raise.

Q. Have you prepared a resume since leaving James A. Rogers?

A. I don't remember.

Q. I have one that was submitted to James A. Rogers, but if you have a more updated one, if you could please get that to Sean so he can get that to me?

A. Can I see the one that you have?

Q. Sure. This comes from our files, so it had to have been produced to James A. Rogers in June or May or March, whenever you applied.

A. Okay. Yeah, I remember this.

Q. If you just want to take that with you, you can. I'm not going to attach it to the deposition, but it's yours if you want to hang onto it. That way if you find a better, more modern one, then you can get that to Sean.

A. Yeah, that's kind of old.

Q. Okay. So if you remember, you guys executed an employment authorization that allowed us to

Page 116

get some of your other employer records, and there's a couple of things that are just confusing. One of them on Redstone, when they were running your background, they did not verify that you actually were employed at USA Truck. USA Truck responded -- they refused to give any information because you were not employed there. It says refuse, not my driver?

A. I was employed there.

Q. Okay. Well, and I don't know, but it was odd.

A. I was employed. I didn't move all the way to Texas without a job. I probably still have the offer letter in my e-mail. I'll try to find that.

Q. Yeah. If you can get anything that is related to USA Truck and get that to Sean, he can get it to me. I'm not going to attach this to the record, but I'll give Sean a copy so he'll know what I'm talking about where it says -- it's marked on there that you --

A. And I can also get my bank statements where my check went through, the deposits. That's not a problem.

Q. Yeah. I don't need a ton, but if you -- I

Phatiffinia Robinson v.
James A. Rogers Excavating, Inc.

Phatiffinia Robinson
September 26, 2025

Page 117

don't need your financial records.

A. Yes. Just something from USA Truck.

Q. I would like to know the pay raise, I'd like to know start date, end date. You know, if you've got anything documenting separation, that would be great. They also gave us your separation form. Let's mark this as Exhibit 10. All right. Do you remember this Denzil Bauer?

(Deposition Exhibit No. 10 was marked.)

A. No. Who is that?

Q. It's listed as your supervisor.

A. This is for who?

Q. This is for Redstone. Denzil Bauer. Second page is a summary of what happened. This is dated December 19, 2022. If you look at --

A. Yeah, I see it. I read it.

Q. All right. The content of Page 2 of Exhibit 10, it says on the morning of December 19, 2022, she failed to properly complete her dump pretrip check. As a result, she loaded her truck with hot asphalt in route to an out-of-town location with a lengthy drive. She stated she noticed a low tire but loaded the truck anyway. She completed the orientation class answering test

Page 118

questions that drivers are never to load a truck if there are mechanical issues present. If the asphalt load cools too quickly, it would be a loss of $2,000. When reminded of the requirements, she parked her load of hot asphalt on Redstone yard and left her duties without permission. By leaving work without permission, she has terminated her employment and will not be eligible for rehire. Is that what happened?

A. No. Like I said, I quit. I don't know who Denzil is, but the guy that was my supervisor at the time, I had already told him like a week prior that I was getting ready to leave, and that that day was probably going to be my last day there, so he already knew that.

That morning I got loaded with asphalt after doing my pretrip. The truck was not -- it was actually my second load, so it wasn't the first load of the day, because we were like at 1:00 or 2:00 in the afternoon. When it got loaded the truck was low on air, the tire was low on air. He wouldn't let me go fill it, so I took it back and he said he would take the load, so it wasn't just left. He went and did it.

Q. You quit work in the middle of the day?

Page 119

A. If that's how you want to put it.

Q. Well, is that what happened?

A. I told him that I was going to leave for the day.

Q. And you didn't go back?

A. No, I did not go back. But they did not treat me unfairly. They were not racist to me, and they were not a bad company to work for.

Q. And why did you leave them again?

A. Because.

Q. Why, if they were a great company, they treated you fairly?

A. I said it was an okay company, it was a good company, but it just wasn't for me. I didn't want to do the asphalt, because I have a heart condition, so breathing in asphalt is a little bit different from just materials. It wasn't for me.

Q. And how long were you off again before -- so that's --

A. I don't remember.

Q. -- six months? Yeah, that was six months before you got another job, because you went from Redstone to James A. Rogers, right?

A. It may have been. I'm not sure. I don't

Page 120

remember.

Q. Well, that says December of '22, and we know you were basically June of '23 before you started working --

A. It could have been.

Q. Did you tell the EEOC that James A. Rogers was mainly a white company?

A. I don't remember. I may have.

Q. But they are not, are they?

A. Mainly, yes. They have lots and lots of employees, not just drivers. They have contractors, they have field guys. It's a lot of people. If you put them all together, finding them is like a needle in a haystack.

Q. But you worked with about eight --

A. I worked --

Q. -- drivers? About eight of them?

A. Uh-huh.

Q. And they were 50/50? We covered them earlier. There were four white and four black, right?

A. Yeah, but we're talking about the whole company.

Q. Did you happen to read the EEOC's -- any of the EEOC's intake notes?

Page 121

A. I did not.

Q. Looks like -- I think this is Quinton told them that he drove the water truck apparently one or two days a week. Do you remember him saying he drove water trucks for the company?

A. I don't know anything about that.

Q. Who did you deal with at the EEOC?

A. Anabel.

MADAM COURT REPORTER: Who?

THE WITNESS: Anabel, if I'm pronouncing that correct.

Q. I think you are. I could spell her last name, but I don't know that I can pronounce it. Did you ever meet with them in person or was it all --

A. No.

Q. -- over the phone?

A. Over the phone.

Q. Okay. Do you ever go down to their office here on 8th and Louisiana?

A. No.

Q. What have you reviewed to prepare for your deposition, any documents?

A. What have I reviewed?

Q. Yes, ma'am.

Page 122

A. I reviewed everything that you've given to me today.

Q. Before your depo?

A. What do you mean, the information from my lawyer?

Q. Yeah. Before today, what documents did you look at to prepare for today?

A. Oh. The notes and everything that my lawyer sent me in the beginning. I don't remember what it's called.

Q. What did they look like?

MR. ROBERTSON: If it's attorney/client privilege, then you need to let me know but --

A. No.

MR. SHORT: No. Is this --

A. Yes, this is what I reviewed.

Q. That's our discovery today?

A. Yes. That's all I reviewed.

Q. And for the record, I talked over you, I'm sorry. But that was Exhibit 8 that you showed me that you reviewed prior to the depo, correct?

A. Yes.

Q. Did you look at anything else that you can recall, like the photos, or did you listen to the

Page 123

recordings?

A. No.

Q. How long has it been since you've talked to Brian or Quinton or John?

A. I haven't talked to none of them really since that recording. I haven't talked to them since then.

Q. Well, since January of '25, do you think you've talked to them since then?

A. No.

Q. Let me see the EEOC document real quick, No. 3. I didn't ask you. You're working at The Blossoms Nursing Rehab. Do you have any plans to go to work anywhere else?

A. No.

Q. I'm going to bounce around a bit because I'm going through my notes. I apologize.

A. Uh-huh.

Q. You pursued different lines of careers with training through the years. Is there any other disciplines that you intend to get an education on and pursue? You're in health care now. You've been driving. You've had the beauty school stuff?

A. Uh-huh.

Page 124

Q. Is there anything else that you intend to do?

A. I'm going to go and finish my nursing degree.

Q. Through UALR or Pulaski Tech or --

A. Actually through Pulaski Tech. I have one more semester of my prereqs, and then I'll be ready to enter the program for 12 months.

Q. You had the business, the Hourglass business?

A. Uh-huh.

Q. Is that the only personal business that you've had?

A. Yes.

Q. Have we covered all disputes that you've had with the employees of James A. Rogers Excavating?

A. Yes.

Q. Canteen and the nursing home, are those the only two sources of income since leaving James A. Rogers?

A. Yes.

Q. Have you ever been -- has a doctor ever told you that you suffer from depression or anxiety?

A. No.

Q. Who is your primary care physician?

A. Dr. Crowell, Karen Crowell.

Q. Crowell, C-r-o-w-e-l-l?

A. Uh-huh.

Phatiffinia Robinson v.
James A. Rogers Excavating, Inc.

Phatiffinia Robinson
September 26, 2025

Page 125

Q. Is that somebody in Bryant, Benton or Little Rock?

A. She's in Little Rock.

Q. Whereabouts?

A. Off of Chenal.

Q. Did you and Louis Austin get into some type of disagreement?

A. No, there was no disagreement. It was just his trucker would text me a little late in the evening, and I didn't like that, but there was no disagreement between me and Mr. Louis, and that's not why I resigned.

Q. What did you tell him about the truckers texting you?

A. That I didn't like it.

Q. Was this like someone wanting to date you kind of thing or was it work related?

A. I don't know. I think maybe he was just kind of flirting.

Q. The worker was?

A. Yeah.

Q. Did Mr. Louis have to do anything to the other driver?

A. He talked to him.

Q. Okay. Did he tell you how that turned out?

Page 126

A. No.

Q. Do you have any intent to make either an EEOC claim or other claim against Mr. Louis for anything that happened while you were employed there, Louis Austin? I'm sorry.

A. No.

Q. Did the worker who was bothering you, how often did that happen?

A. I mean, I wasn't there.

Q. He's texting you. You said it bothered you that he was texting you?

A. Well, it bothered me that he texted me after hours. I still have it in my phone if you'd like to see it.

Q. How often did that happen?

A. That just happened that one time, and I nipped it in the bud.

Q. Okay. Was there anything inappropriate in the text? I don't need to see it, but that you contend was inappropriate? Did he sent a picture?

A. Yeah, he did. It wasn't a nude picture or anything, but it was a picture of him having a drink in some jogger pants.

Q. In some what?

Page 127

A. Jogger pants.

Q. Jogger pants.

A. And he just said, enjoy your Friday, have a drink; I'm having one. That was it.

Q. Did you respond?

A. No.

Q. Are there any documents that you expect to get to support your claim? Like sometimes people say I'm waiting to hear back from somebody to get X, Y and Z. Is there anything else that you're waiting on to support your claim that you're making against James A. Rogers Excavating?

A. Not to my knowledge.

Q. Have we covered all of the relevant witnesses who you believe support your claim?

A. Yes.

Q. Have I been courteous to you today?

A. You've been okay.

        MR. ROBERTSON: Pass the witness.

        MR. SHORT: Nothing at this time.

        (Deposition proceedings concluded at 3:43 p.m.)

Page 128

                CERTIFICATE

STATE OF ARKANSAS  )
                   )   ss:
COUNTY OF PULASKI   )

    I, KELLY HILL, Certified Court Reporter, a notary public in and for the aforesaid county and state, do hereby certify that the witness, PHATIFFINIA ROBINSON, was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein; that the testimony of said witness was taken by me stenographically, and was thereafter reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record of the testimony given to the best of my understanding and ability.
    I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

                    Kelly D. Hill
                    Certified Court Reporter
                    State of Arkansas
                    Certification #515