IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

PHATIFFINIA ROBINSON                                                    PLAINTIFF

Vs.                          Case No. 4:24-cv-852-DPM

JAMES A. ROGERS EXCAVATING, INC.                                       DEFENDANT

## DECLARATION OF CHRIS MEYER

1.      My name is Chris Meyer. I am over the age of nineteen (19) and a resident of Pulaski County, Arkansas. I have personal knowledge of the matters testified herein, which are true and accurate to the best of my knowledge and belief.

2.      I am the owner of James A. Rogers Excavating, Inc. ("JARE"), and I am responsible for setting, approving, or modifying the compensation of JARE's truck drivers. I am also involved in the day-to-day operations of the business and assist in personnel decisions, and I am ultimately responsible for maintaining the company's business records and personnel files.

3.      Ms. Robinson was interviewed by Ken Meyer for an open dump truck driver position in mid-May of 2023.  I personally met Ms. Robinson during her interview, and I liked her and agreed with Ken's decision to hire Ms. Robinson.

4.      At the time of her hiring, Ms. Robinson possessed a valid CDL which restricted her to only driving automatic transmission vehicles.  We prefer to have drivers who are qualified to operate manual and automatic transmissions because manual transmissions are used in most of our

1

**EXHIBIT 2**

cM

equipment. However, we had an automatic transmission dump truck available for Ms. Robinson's use.

5.     At the time of her hiring, Robinson had less experience as a commercial driver. While employed by JARE, Robinson's job duties consisted solely of hauling materials from various quarries to various JARE job sites.

6.     Other drivers have more responsibilities. For example, the drivers who operate tanker trucks require elevated skill level and experience due to the dangers involved with load shift, which is inherent when hauling fluid. The load shift from fluid impacts the ability to safely control the truck; it is a more hazardous job.

7.     Equipment hauling also involves greater risk and requires elevated skill and experience as a driver. At the time of Ms. Robinson's employment, we had two drivers assigned to the low-boy tractor trailers used to haul heavy equipment. One was Adam Parker, whose title was "Truck Boss," and the other was Quindon Cox. The two low-boy rigs haul more weight, and each rig uses a manual transmission. Equipment hauling is one of the most hazardous positions we have.

8.     Adam Parker was Ms. Robinson's direct supervisor. He was the first line of supervision over the drivers. Mr. David Babbitt was the superintendent of the work sites; Mr. Babbitt would interact with drivers at the work sites and may direct where the drivers are to drop their loads. Mr. Babbitt was also responsible for the work flow at the job sites, and drivers are expected to follow his instructions while on the job sites.

9.     I directly supervised Mr. Babbitt and Mr. Parker. Any employee is free to speak directly with me if they have a question or concern or if they are uncomfortable speaking with their direct supervisor for any reason.

10.     Driver pay is adjusted based on performance, tenure, and responsibilities. Ms. Robinson was a new driver with limitations on what she could drive; she was not qualified to operate manual transmissions, drive the water truck, or haul heavy equipment. That is why she started with our base pay at the time, which was $18.50 per hour. By way of example, a male driver with similar experience (Brandon Shelton), was hired the year before Ms. Robinson at the base rate of $18.25, which was the new hire rate for more inexperienced drivers at that time in 2022.

11.     JARE is a family business which employs male and female members of my family, and we strive to promote a balanced work force with qualified employees. We also strive to match skill sets to the available positions. During the time frame of Robinson's employment, JARE employed three other female dump truck drivers and four male drivers. We will match the qualifications of the driver to the specific pieces of equipment, and we will not put a person who is certified only on automatic transmissions in a truck with a manual transmission. We typically will assign one driver to each dump truck so that the driver becomes intimately familiar with her equipment for efficiency and safety reasons. This also allows us to better monitor who is responsible for any equipment damage.

12.     Quindon Cox made $21.00 per hour when Ms. Robinson was employed at JARE. Again, Mr. Cox was one of two equipment haulers. Mr. Cox was qualified to operate trucks equipped with manual transmissions. The other equipment hauler, Adam Parker, made $22.50 per hour at the time. Adam was more tenured and also served as the truck boss. Mr. Parker was qualified to operate trucks equipped with manual transmissions.

13.     Vic Norman, who previously worked for JARE, was re-hired a week or so before the decision to lay off Ms. Robinson. His primary job was to operate the water truck, and his

3

hourly rate was $19.25. Mr. Norman could operate a dump truck when not operating the water truck. Mr. Norman was qualified to operate trucks equipped with manual transmissions.

14. I was notified of the mistakes Ms. Robinson had made while employed with JARE, which is a common practice with new drivers. I monitor the employees' performance so that we can assess who is better suited for increased responsibilities and pay raises, or if warranted, discipline.

15. On May 25, 2023, just days after Robinson started with JARE, she hit a gate, causing some damage. Ms. Robinson was confronted about it, and she admitted to her supervisor that she had in fact hit the gate. It is JARE's policy that drivers immediately report accidents and any amount of damage to their supervisors; Robinson did not report the damage. Robinson was reminded by Mr. Parker to report all accidents. I remember forming the belief at the time these events were reported to me that Ms. Robinson never intended to report the damage, but I hoped this would be an isolated, new-driver mistake.

16. On May 30, 2026, JARE management received three separate phone calls reporting that Ms. Robinson was driving too fast through a job site and not paying attention to site operators. Her actions resulted in incomplete loads and contributed to unwanted dust at the worksite. (Dust control is a significant issue due to the workers on open-station equipment and on the ground having to endure the dust created when trucks and equipment travel too fast through the job site.) Robinson was again counseled at the end of the workday, and when this was reported to me, I again hoped this would be an isolated new-driver mistake.

17. On June 12, 2023, JARE management was once again contacted by a pit operator regarding Plaintiff's excessive speed on a job site. The pit operator reported that Ms. Robinson gave him attitude when he told her to slow down. Mr. Parker again instructed Ms. Robinson to

4



stay under 10 mph while on job sites for dust control. I learned of this event sometime after June 12, 2023.

18. At 4:09 pm on June 12, 2023, I received a text message from Robinson asking to have a conversation with me. In a telephone conversation that evening, Robinson made a complaint against a JARE superintendent David Babbitt that she described as "rude" and "disrespectful" to her. Robinson told me that Mr. Babbitt had yelled at her to roll her window down on one occasion.

19. I want my supervisors to communicate professionally with the drivers, and I told Robinson that I would address her concerns with the superintendent. I spoke with Mr. Babbitt who expressed his frustration with Ms. Robinson not listening and dumping her load in the wrong location, which negatively affects workflow at the site. I counseled Mr. Babbitt to communicate professionally with employees even when he is frustrated with their mistakes.

20. To my knowledge, Mr. Babbitt did not repeat the conduct for which he was counseled, and Robinson made no other complaints to me regarding inappropriate behavior or comments from Mr. Babbitt or any other JARE employees. Ms. Robinson knew she could speak directly with me if she had a concern, because she had done so with her complaint about Mr. Babbitt.

21. There were no other issues with Ms. Robinson for the next several weeks. However, by mid-July 2023, I noticed a decline in available workload and a lack of replacement contracts for work in the near future. I personally made the decision to downsize the workforce to optimize efficiency within the company, and I had to assess who would be the best person to let go while maintaining the most efficiency and productivity of the company.

22.    Robinson was one of JARE's most recent hires with the less experience, and she had limited qualifications in that she could only operate dump trucks with automatic transmissions. I was also mindful that she had already generated several complaints regarding her failure to report her accident, and multiple complaints from job site personnel for the issues described above. Based on these factors, I made the decision to lay off Robinson and terminate her employment, effective July 21, 2023.

23.    JARE was later served with Robinson's complaint to the EEOC. I learned that Ms. Robinson believed she worked in a hostile work environment and that she believed she was treated unfairly when compared to male employees. Over the course of those proceedings, she specifically mentioned Vic Norman and Quindon Cox as being treated more favorably than her. However, Ms. Robinson's responsibilities and qualifications were distinctly different than those of Mr. Norman and Mr. Cox.

24.    As discussed above, Vic Norman had higher responsibility of driving the water tanker truck, which is a critical function in the company, and which is more hazardous than operating a dump truck. Ms. Robinson was not qualified to operate the tanker truck; her job was different and limited to operating a dump truck with an automatic transmission. Mr. Norman, in addition to being qualified to operate the tanker truck, was qualified to operate both models of dump trucks (automatic and manual transmissions). These distinctions warranted Mr. Norman's slightly higher pay as well as justifying the decision to keep him over Ms. Robinson when deciding who to lay off.

25.    Likewise, Quindon Cox, was an experienced driver who hauled heavy equipment. Only Mr. Cox and Mr. Parker were authorized to haul the heavy equipment at the time, which is arguably the most hazardous driving job within the company. Ms. Robinson was not qualified to

6

operate the low-boy tractor trailer rigs, both of which have standard transmissions. Ms. Robinson did not have the same qualifications or responsibilities as Mr. Norman or Mr. Cox.

26.     I made the decision to lay off Robinson due to her lackluster job performance, short tenure with the company, more limited responsibilities within the company, as well as her more limited experience and qualifications overall which limited her usefulness to the company. Her gender played no role in my employment decision.

27.     I understand under penalty of perjury that I can be held in contempt of Court and sanctioned as deemed appropriate by the Court if it is determined that any of the statements contained in this declaration are not truthful.

28.     This declaration is executed on my own free will.

29.     Pursuant to 28 USC §1746, I declare under penalty of perjury that the foregoing Declaration is true and correct to the best of my knowledge and belief.

EXECUTED on this __1__ day of __July__, 2026.

Chris Meyer